[Civ. No. 22358. First Dist., Div. Two. Nov. 25, 1966.]

O'NEIL A. GHERNA, Plaintiff and Appellant, v. FORD MOTOR COMPANY et al., Defendants and Respondents.

Sanford, Barry, Staiger & Seaver, Warren Staiger and Carolyn Jones for Plaintiff and Appellant.

Barfield, Barfield & Dryden, Mitchell & Henderson and Cyril Viadro for Defendants and Respondents.

TAYLOR, J.—Plaintiff, O'Neil A. Gherna, appeals from a judgment of nonsuit entered at the close of the presentation of his evidence in an action for negligence and breach of warranty in causing a fire of unknown origin in the engine compartment of a 1957 Thunderbird automobile manufactured by defendant, Ford Motor Company (hereafter Ford), and sold to plaintiff by defendant, Harvey M. Harper Company (hereafter Harper). Plaintiff argues that he produced sufficient evidence to go to the jury on several theories of liability.

Viewing the record in the light most advantageous to plaintiff, as we must, the following facts appear: Plaintiff read the advertisements about the 1957 Thunderbird and on July 19, 1957, bought the automobile from Harper, the franchised dealer in Eureka. The purchase price was $4,649.40. After July 19, 1957, the vehicle was never out of his possession except for the servicing by Harper at about 400 miles on July 30, about 1,000 miles on August 22, and about 1,600 miles on September 18, 1957. Whenever gas or oil was put into the car, plaintiff got out to see what was being done. At the time of the purchase, plaintiff received the Ford 1957 vehicle service policy and also the regular new car warranty good for 4,000 miles or 90 days.

Plaintiff used the car chiefly to drive from his home to his place of employment, the Holmes Eureka Lumber Company, and also drove on a few short trips to Crescent City. On September 21, 1957, he drove the car as usual and parked it near the lumber plant about 7:30 a.m. He returned to the car at noon, drove a few miles to Broadway to get gas and have the oil and water checked and then returned, parked in the same spot and walked away toward the lumber plant. When he had walked about 100 feet, he noticed smoke pouring out of the right side of the hood of the automobile. He ran back to the car and asked someone to call the fire department. When the fire department arrived about 10 minutes later, the vehicle was blazing thoroughly, but the fire was put out and the car towed away. After Harper and Ford refused to repair the vehicle, it was transported to San Francisco by plaintiff's insurance company and repaired by a Ford dealer there for $2,223.04, plus transportation bills of $48.67 each way.

Plaintiff kept the vehicle in a carport and never locked it. It was driven by plaintiff only, or in his presence, by his wife who then had a learner's permit. Prior to the fire, there had been no problems with the automatic transmission. An oil leak was repaired on September 18, 1957. Plaintiff did not know whether this leak was from the motor or the transmission oil.

On September 21, plaintiff watched the service station attendant put gas into the car. He did not smell any gasoline prior to the fire. Plaintiff was smoking a cigarette but put it out on the ground on the left-hand side of the car. He saw no smoke at that time. After the fire, he noticed that the heat concentration appeared to be in the right front underside of the hood and that the battery had melted and the right front tire burned. He further testified that he always drove the car carefully and never tried to "burn rubber" or "rev up the motor." Two days after the fire, he was contacted by a representative of Ford who questioned him about the loss.

Lars Jacobson, an industrial engineer for Ford, was qualified as an expert witness and questioned by plaintiff under section 2055 of the Code of Civil Procedure. He inspected plaintiff's vehicle three days after the fire at the request of Ford but never saw or talked to plaintiff. Jacobson's testimony that he had found no evidence of a wire that had burned from the inside through its insulation to the outside was impeached by his prior deposition to the contrary. He therein stated that there was evidence of a short in the power source, particularly a two-inch portion of a wire with its insulation burned off leading from the positive terminal of the battery to the point of contact on the battery carrier. There were no open gas lines but the fuel filter bowl located on the left side of the engine had been melted off. Most of the wiring in the engine compartment had been destroyed and its insulation destroyed by an external source of heat. The top half of the front right tire was also burned. The exterior of the carburetor was partially melted but there was no evidence of an internal carburetor fire. The generator coils had been burned and the power brake vacuum hose had been destroyed. There was no evidence of backfiring as the inside of the carburetor had the normal brown color.

Jacobson also testified that the automatic transmission of the car contained 12 quarts of specially compounded automatic transmission oil. The transmission dipstick is located at the back of the exhaust manifold which is warm or hot whenever the engine is running. The transmission fluid is a highly flammable and volatile substance kept under pressure. Under increased pressure, the highly flammable transmission fluid can easily come out of the dipstick hole and cause a fire or explosion after coming in contact with the hot exhaust manifold. Both the transmission dipstick and exhaust manifold are on the right-hand side of the car so that, if the transmission fluid

under pressure hit the manifold and burned, the right front tire would very definitely be involved but since the engine compartment is separated from the passenger compartment by a fire wall and from the two front tires by sheet metal, it is unlikely that a fire could proceed from the tire to the engine.

In the 1957 Thunderbird with its 245 horsepower engine, it was possible to boil the transmission oil in 30 seconds by giving it full throttle with the gas pedal and holding the brake while the transmission is in gear. The transmission oil would boil in even less time if the car had been driven even the short distance from the lumber plant to Broadway, as plaintiff testified. The booklet given to car owners with the car did not mention this danger as the manufacturers regarded it was just common sense not to give the car full throttle and hold the brake pedal while the transmission is in gear. The booklet did, however, contain a warning about gunning the engine or rocking the car stuck in snow or sand. It was also possible that the transmission oil would boil if the car were driven over 35 miles an hour in low gear. From the record of the repair work done on the vehicle after the fire, Jacobson concluded that the transmission had been abused.

The questions here presented are whether or not the evidence was sufficient: 1) to support a finding of negligence against defendants under res ipsa loquitur; 2) to support a finding of liability of either or both defendants under the doctrine of strict liability because of the unsafe or defective design of the automobile; 3) to support a finding of negligence, without the application of res ipsa, because of the failure to instruct or caution plaintiff; and 4) to support a finding of liability based on breach of express or implied warranty.

A nonsuit may be granted only where, disregarding conflicting evidence on behalf of defendants and giving to plaintiff's evidence all the value to which it is legally entitled, therein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of plaintiff (*O'Keefe* v. *South End Rowing Club*, 64 Cal.2d 729, 733 [51 Cal.Rptr. 534, 414 P.2d 830]).

Neither the appellate court nor the lower court may weigh the evidence or consider the credibility of the witnesses (*Lasry* v. *Lederman*, 147 Cal.App.2d 480 [305 P.2d 663]).

Plaintiff may rely on that portion of testimony given under Code of Civil Procedure section 2055, which is favorable

to him, and disregard the unfavorable portions (*Anthony* v.
*Hobbie*, 25 Cal.2d 814 [155 P.2d 826]). However, the
evidence produced by plaintiff must support a logical infer-
ence in his favor, sufficient to raise more than a mere conjec-
ture or surmise that a fact is as alleged in order to warrant
submission of the question to a jury and a court should not
put itself in the incongruous position of destroying logic to
hold a case in court (*Reynolds* v. *Natural Gas Equipment,
Inc.*, 184 Cal.App.2d 724, 731 [7 Cal.Rptr. 879]). We have
concluded that the judgment of nonsuit entered herein must
be reversed as, applying the above rules to the facts adduced
by plaintiff, there was sufficient evidence to submit the matter
of defendants' liability to the jury on several theories.

## I. RES IPSA LOQUITUR

In our opinion, there was prima facie proof sufficient to
require submission of the applicability of res ipsa loquitur to
the jury. The doctrine has three factual conditions: (1)
the accident must be of a kind which ordinarily does not occur
in the absence of someone's negligence; (2) it must be caused
by an agency or instrumentality within the exclusive control
of defendants; and (3) it must not have been due to any
voluntary action or contribution on the part of plaintiff
(*Ybarra* v. *Spangard*, 25 Cal.2d 486 [154 P.2d 687, 162 A.L.R.
1258]; *Baker* v. *B. F. Goodrich Co.*, 115 Cal.App.2d 221 [252
P.2d 24]).

 It is well settled that the first condition is satisfied if
there is a basis of experience, either common to the community
or brought out in the evidence, from which it may reasonably
be concluded that the accident is of a kind which does not
ordinarily occur unless someone has been negligent (*Hercules
etc. Co.* v. *Automatic etc. Corp.*, 151 Cal.App.2d 387 [311 P.2d
907]; *Zentz* v. *Coca Cola Bottling Co.*, 39 Cal.2d 436 [247 P.2d
344]; *Baker* v. *B. F. Goodrich Co., supra*). The more recent
cases stress the point that this condition requires that a bal-
ance of probabilities points to defendants' negligence.

We think it is a matter of common knowledge that new
automobiles which have been properly driven for only about
1,600 miles do not suddenly develop a fire in the engine com-
partment without someone's negligence. Furthermore, there
was conflicting evidence as to whether the fire was started by
the short in the wiring of the engine and such a short would,
of course, be an affirmative indication of negligence. Thus, the
first condition was satisfied, at least to the extent of presenting
a question to be resolved by the trier of facts.

■ As to the second condition, i.e., defendants' exclusive control, the words "exclusive control" have been liberally construed (*Ybarra* v. *Spangard, supra,* at p. 493; *Roddiscraft, Inc.* v. *Skelton Logging Co.,* 212 Cal.App.2d 784 at p. 799 [28 Cal.Rptr. 277]). In order to satisfy this condition, it is not necessary to show that a defendant had control of the instrumentality at the time of the accident where the evidence shows that after he relinquished control, the instrumentality had not been changed or that it had not been mishandled (*Burr* v. *Sherwin Williams Co.,* 42 Cal.2d 682 [268 P.2d 1041]; *Ybarra* v. *Spangard, supra*). It is settled that a plaintiff does not have to eliminate every possibility of damage or change to the instrumentality after a defendant relinquishes control (*Zentz* v. *Coca Cola, supra*). The condition is satisfied if there is evidence, conflicting or otherwise, that supports a reasonable inference that the instrument was not mishandled or changed (*Escola* v. *Coca Cola Bottling Co.,* 24 Cal.2d 453 [150 P.2d 436]; *Baker* v. *B. F. Goodrich Co., supra*).

■ It is undisputed that in the instant case, the automobile engine was manufactured by Ford and sold by Harper. After the automobile was sold to plaintiff, it was continually in his possession except for the brief periods of time when the engine was serviced by Harper. Nothing else was done to the automobile except the purchase of gasoline and checking of water and oil at various service stations. Plaintiff's testimony would indicate that the instrumentality had not been changed or mishandled after relinquishment by defendants. The evidence here was sufficient to require a determination by the finder of facts as to whether the control condition of the res ipsa loquitur doctrine applied.

■ The third and final condition, lack of any voluntary action or contribution on plaintiff's part, also finds support in the record when viewed in accord with the rule applicable to nonsuits. Plaintiff testified that the cigarette he was smoking, when he parked the car shortly before the fire, was put out on the ground. He also testified to his normal use of the car for its intended purpose and *there was a conflict in the evidence as to whether or not the transmission had been abused.* Here, as in *Exploration Drilling Co.* v. *Heavy Transport, Inc.,* 220 Cal.App.2d 397 [33 Cal.Rptr. 747], the applicability of the doctrine would depend on whether the jury believed defendants' or plaintiff's version of the facts. If the jury accepted plaintiff's testimony that the cigarette was extinguished and that he had not abused the car's transmission, the third condi-

tion of res ipsa loquitur would be amply supported by the evidence.

Evidence was present in the record which could have satisfied all three requirements of the doctrine. ▮▮▮ In considering the applicability of res ipsa, it is not for the trial court to ascertain whether a defendant's negligence is the more likely explanation of the accident. The court merely determines whether the plaintiff has produced sufficient substantial evidence to permit a jury to draw such an inference. Where reasonable men may differ as to the balance of probabilities, the trial judge must leave the question to the jury (*Bauer* v. *Otis*, 133 Cal.App.2d 439 [284 P.2d 133]; *Seneris* v. *Haas*, 45 Cal.2d 811 [291 P.2d 915, 53 A.L.R.2d 124]; *Hercules etc. Co.* v. *Automatic etc. Corp., supra*). ▮▮▮ Where, as here, there is evidence that would support the application of res ipsa loquitur, the granting of a nonsuit is erroneous (*Raber* v. *Tumin*, 36 Cal.2d 654 [226 P.2d 574]; *Hinds* v. *Wheadon*, 19 Cal.2d 458 [121 P.2d 724]; *Towers* v. *Massey-Harris Co.*, 145 Cal.App.2d 210 [302 P.2d 77]; *Mayers* v. *Litow*, 154 Cal.App. 2d 413 [316 P.2d 351]; *McLaughlin* v. *Lasater*, 129 Cal.App. 2d 432 [277 P.2d 41]). The jury, under appropriate contingent instructions, should have been permitted to conclude whether the three factual conditions of the doctrine had been met (*Seneris* v. *Haas, supra*; *Baker* v. *B. F. Goodrich Co., supra*; BAJI 206-A, Rev.).

## II. Strict Liability

▮▮▮ The evidence produced by plaintiff was sufficient to permit the jury to determine whether an unsafe or defective design and manufacture of the 1957 Thunderbird resulted in the fire loss and thus to allow recovery against both defendants under the doctrine of strict liability. ▮▮▮ As set forth in the landmark decisions of *Greenman* v. *Yuba Power Products, Inc.*, 59 Cal.2d 57 [27 Cal.Rptr. 697, 377 P.2d 897], and *Vandermark* v. *Ford Motor Co.*, 61 Cal.2d 256 [37 Cal.Rptr. 896, 391 P.2d 168], the strict liability of a manufacturer and his retailer are established when the plaintiff proves that he was injured while using the instrumentality in a way it was intended to be used as a result of a defect in design and manufacture of which plaintiff was not aware and which made the vehicle unsafe for its intended use. There is no merit in defendants' argument that the above rule applies only in cases resulting in personal injury. It is settled that the doctrine of strict liability applies to physical harm to person or property

(*Seely* v. *White Motor Co.*, 63 Cal.2d 9 [45 Cal.Rptr. 17, 403 P.2d 145]; *Fentress* v. *Van Etta Motors*, 157 Cal.App.2d Supp. 863 [323 P.2d 227]; *Mack* v. *Hugh W. Comstock Associates*, 225 Cal.App.2d 583 [37 Cal.Rptr. 466]; Rest.2d Torts, § 402 A).

 The burden is on plaintiff to show that the automobile was defective and that the defect caused the fire. However, as pointed out in *Vandermark, supra,* at page 260, he may do so by circumstantial evidence. In *Vandermark,* the damage to the car in the collision precluded any direct determination that the master cylinder assembly had been improperly installed or adjusted before the accident. Similarly here, the damage to the engine compartment by the fire precluded any direct determination that the fire was caused by a short in the wiring system, but the deposition of the witness Jacobson in regard to the burned wire furnished circumstantial evidence from which such a determination could be reasonably inferred. He also testified to the potential fire hazard created by the juxtaposition of the transmission dipstick and exhaust manifold. Thus, there was sufficient circumstantial evidence from which the jury could have found that either of the defects alluded to resulted in the fire and the consequent damage.

 The question remains whether the record, considered in the light most favorable to plaintiff, established that he was using the automobile in the way it was intended to be used. As stated previously, plaintiff testified that he operated the car normally and the evidence was conflicting as to whether he had abused the transmission. We can only conclude that here again we have a jury question and the trial court erred in granting a nonsuit (*Vandermark* v. *Ford Motor, supra,* p. 261).

### III. NEGLIGENCE

The next question is whether there was sufficient evidence on negligence, unaided by the doctrine of res ipsa loquitur, to allow the question to go to the jury. Proof of specific acts of negligence does not preclude reliance on res ipsa loquitur and vice versa (*DiMare* v. *Cresci,* 58 Cal.2d 292 [23 Cal. Rptr. 772, 373 P.2d 860]). Plaintiff's evidence indicates that defendants knew of the danger of fire resulting from operating the Thunderbird under various conditions which could cause the highly volatile and flammable transmission fluid to come in contact with the hot exhaust manifold. It is uncontroverted that Ford did not include a warning as to such dangers in its handbook, or otherwise, except for the

admonition against rocking the car when stuck in sand or snow. ▮▮▮ A manufacturer, as well as a dealer, must give adequate warning to the ultimate users of the product of any dangerous propensity which it knows or should have known would result in the type of accident that occurred (*Crane* v. *Sears Roebuck & Co.*, 218 Cal.App.2d 855 [32 Cal.Rptr. 754]). Nor can defendants be exonerated by the fact that the transmission fluid was manufactured by another party as Ford was aware of its highly volatile and flammable qualities and put its own label on it. As indicated by section 402 A of the Restatement Second of Torts, a product, although faultlessly made, may nevertheless be deemed "defective" if it is unreasonably dangerous to place the product in the hands of a user without a suitable warning (*Canifax* v. *Hercules Powder Co.*, 237 Cal. App.2d 44 at pp. 52-53 [46 Cal.Rptr. 552]; Rest. 2d, Torts, § 402 A; *Reynolds* v. *Natural Gas Equipment, Inc., supra*). ▮▮▮ The questions of negligence, proximate cause and contributory negligence should have been submitted to the jury under appropriate instructions.

## IV. BREACH OF WARRANTY

▮▮▮ In addition, plaintiff's evidence was sufficient to indicate a cause of action based on breach of warranty. The uncontroverted evidence indicates that plaintiff received the standard new automobile warranty whose pertinent provisions are set forth in a footnote,[1] and that the fire occurred within the warranty period. This is the uniform warranty of the automobile manufacturers association and used by all of the major

---

[1] "Dealer warrants to Purchaser (except as hereinafter provided) each part of each Ford Motor Company product sold by Dealer to Purchaser to be free under normal use and service from defects in material and workmanship until such product has been driven, used or operated for a distance of four thousand (4,000) miles or for a period of ninety (90) days from the date of delivery to Purchaser, whichever event first shall occur. Dealer makes no warranty whatsoever with respect to tires or tubes. Dealer's obligation under this warranty is limited to replacement of, at Dealer's location, or credit for, such parts as shall be returned to Dealer with transportation charges prepaid and as shall be acknowledged by Dealer to be defective. This warranty shall not apply to any Ford Motor Company product that has been subject to misuse, negligence or accident, or in which parts not made or supplied by Ford Motor Company are used if, in the sole judgment of Dealer, such use affects its performance, stability or reliability, or which shall have been altered or repaired outside of Dealer's place of business in a manner which, in the sole judgment of Dealer, affects its performance, stability or reliability. This warranty is expressly in lieu of all other warranties, express or implied, and of all other obligations or liabilities on the part of Dealer, except such obligation or liability as Dealer may assume by its Authorized Ford Dealer's Service Policy or separate written instrument."

652

manufacturers. As pointed out in the leading case of *Henningsen v. Bloomfield Motors, Inc. (1960)* 32 N.J. 358 [161 A.2d 69 at pp. 79 and 87, 75 A.L.R.2d 1], there is no competition among car makers in the area of the express warranty, the warranty in its standard form is imposed on the consumer without any bargaining for it, and usually comes to the buyer through the dealer who is without authority to alter it. Thus, courts have held the warranty applicable to both the manufacturer and the dealer, and have strictly construed the terms of the warranty in favor of the buyer (*Rose v. Chrysler Motors Corp.*, 212 Cal.App.2d 755, 757-760 [28 Cal.Rptr. 185, 99 A.L.R.2d 1411]; 99 A.L.R.2d 1419; *Greenman v. Yuba Power Products, Inc., supra,* p. 63; *Henningsen v. Bloomfield Motors, Inc., supra*). It is equally well settled that the substance of the express warranty does not in any way negate any of the implied warranties imposed by law (*Rose v. Chrysler, supra,* pp. 761-762). Here, plaintiff adduced sufficient evidence that he had taken proper care of the automobile, had operated it in a normal fashion and had not engaged in any conduct which might result in making either the implied or express warranties inapplicable.

Furthermore, there is evidence that plaintiff had seen Ford's advertisements for the 1957 Thunderbird.[2] As pointed out in *Henningsen v. Bloomfield, supra,* judicial notice may be taken of the fact that automobile manufacturers, including Ford, undertake large-scale advertising programs over television, radio, in newspapers, magazines and other media of communication in order to persuade the public to buy their products. As indicated in *Greenman v. Yuba Power, supra,* when a manufacturer engages in advertising in order to bring his goods and their quality to the attention of the public and thus to create a consumer demand, the representations made constitute an express warranty running directly to a buyer who purchases in reliance thereon.

As to the warranty of merchantability, it becomes apparent that manufacturers who enter into promotional activities to stimulate consumer buying may thereby incur both express and implied warranty obligations. It has been held that where an express warranty arises independently of a contract of sale, the provisions of the uniform sales act (Civ. Code, §§ 1721-1800) relative to notice, etc., are not applicable

---

[2]This advertising represented that the Thunderbird was designed and built to give the road performance required by the most exacting motoring enthusiast.

(*Greenman* v. *Yuba Power, supra*), and also that the implied warranties of Civil Code section 1735, subdivisions (1) and (2), pertain. ▮ Thus, the facts here adduced were sufficient to submit the matter of a breach of express and implied warranty by both Ford and Harper to the jury (*Rose* v. *Chrysler, supra*; *State Farm Mut. Auto. Ins. Co.* v. *Anderson-Weber, Inc.* (1961) 252 Iowa 1289 [110 N.W.2d 449]).

The judgment of nonsuit is reversed.

Shoemaker, P. J., and Agee, J., concurred.