[Civ. No. 31132. First Dist., Div. Two. Dec. 12, 1973.]

KAISER CEMENT & GYPSUM CORPORATION,
Plaintiff and Appellant, ·v.
ALLIS-CHALMERS MANUFACTURING COMPANY,
Defendant and Appellant.

950

**COUNSEL**

Rockwell, Keenan & Mathewson for Plaintiff and Appellant.

Carnes & Bailey and Thomas M. Carnes for Defendant and Appellant.

**OPINION**

**TAYLOR, P. J.**—In these consolidated appeals,[1] the major questions are the propriety of the order granting a new trial on the sole ground that the verdict was "against the law" and the sufficiency of the evidence to support the verdict in favor of Kaiser on the bifurcated issue of liability on Kaiser's causes of action for breach of warranty against Allis-Chalmers. We have concluded that the order granting the new trial must be reversed, the matter remanded for trial on the amount of damages, and the order denying the motion for a judgment notwithstanding the verdict, affirmed.

The record indicates that the new trial was granted solely on the ground that "the verdict is against the law." Kaiser's cause of action was barred by the statute of limitations. ■ The rule that on appeal every intendment is in favor of the order granting a new trial is not applicable where the question presented is purely one of law, and if there is any substantial evidence to support the judgment, the new trial order must be reversed unless some error of law is actually demonstrated (*Treber* v. *Superior Court,* 68 Cal.2d 128, 136 [65 Cal.Rptr. 330, 436 P.2d 330]; *Reusche* v. *California Pac. Title Ins. Co.,* 231 Cal.App.2d 731, 733-734 [42 Cal. Rptr. 262]; *Hawkinson* v. *Oesdean,* 61 Cal.App.2d 712 [143 P.2d 967]).

Viewing the evidence most strongly in favor of the verdict and judgment, the following facts appear: On December 1, 1961, Kaiser submitted its request for quotation for motors to drive the raw and finished mills of its new automated cement plant in Montana City, Montana. The specifications for a 2,500 h.p. and a 1,000 h.p. ball mill auto synchronous[2] electric motor

[1]Kaiser appeals from the order granting the new trial. Allis-Chalmers appeals from the order denying its motion for a judgment notwithstanding the verdict.

[2]Every electric motor contains a stator and a rotor. The stator is a circular object interwoven with coils of conductors. Insulation protects these conductors from short circuiting. The introduction of alternating current into the stator coils creates magnetic poles which constantly rotate around the stationary stator. The stator surrounds

were submitted to several manufacturers, including Allis-Chalmers. The specifications required that the motors fulfill specific operating requirements and required the manufacturer-seller to provide all necessary protection devices as a unit bid, including "automatic protection against damage" from operating conditions "in excess of the equipment rating."

Allis-Chalmers submitted a proposal agreeing to fabricate the motors pursuant to Kaiser's specifications. The proposal specifically provided that the motors would be "self-ventilating" and operate within a "guaranteed temperature rise of 40° C., over an ambient temperature[3] of 40° C." On January 29, 1962, Kaiser accepted the Allis-Chalmers proposal.

As these motors were to operate the automated plant, their reliability was a crucial factor. The minimal life expectancy of motors like these is 20 years. The safeguards the manufacturer provides in respect to temperature rise, particularly in relation to motor design for such rise and insulation of the windings, determines the life expectancy of the motors and their reliability from failure. The pertinent portion of the contract documents contained the following separate provisions: "Seller warrants that said merchandise will correspond with the description of the same on the reverse side of this order, will conform to any applicable specifications, and shall be of good merchantable quality and fit for the known purpose for which it is sold."

"QUALITY. The equipment furnished under this specification shall be of the highest degree of reliability and freedom from maintenance obtain-

---

but does not touch a wheel-like object called the rotor. The rotor is attached to the drive shaft. In a simple induction motor, the rotor contains no coils but simply has stationary magnetic poles energized by induced current from the stator. As the stator magnetic poles rotate around the stationary stator, they attract the stationary poles of the rotor and cause the rotor to rotate. In the more complex wound rotor induction motor, the rotor has coils for purposes of controlling the amount of stator current induced into the rotor. In the even more complex auto synchronous motor, the rotor not only has coils but these coils have an independent power source of direct current supplied by a generator driven by yet another electric motor. Thus, in an auto synchronous motor, the rotor is energized by two power sources: direct current into the rotor coils from the generator and induced stator current into the rotor.

[3]The increase in heat from the two heat sources of an auto synchronous motor is technically termed "temperature rise" of the rotor over the temperature of the motor room environment, technically termed the "ambient." Since an auto synchronous motor can produce the necessary torque (power) in a very smooth manner, it greatly reduces the wear on each of the $200,000 Smith reduction gears to which these motors or drives were attached. The rotor in an auto synchronous motor looks somewhat like a wide cogged wheel. The indentations between the cogs are termed "slots" into which the coils are fitted.

able by existing fabrication methods and the application of all engineering data available to the fabricator. The evaluation of proposals will be based on reliability, anticipated freedom from mill down-time for maintenance, quality, cost of maintenance, engineering and delivery schedules and the proposed quotation."[4]

"GUARANTEE. 13.1. All equipment furnished under this specification shall be guaranteed against defective material and workmanship for a period of one year from the date of acceptance by Purchaser.

"13.2. The Vendor shall guarantee the performance of all equipment in accordance with the requirements of this specification.

"Should any part of the equipment fail to function, or to meet the required performance, the Vendor shall immediately make changes or additions at the equipment site as necessary to fulfill the conditions, including removing and replacing any parts required for the correction, all without cost to the Owner."

Each of these provisions was restated directly or by implication in Kaiser's purchase order of January 29, 1962, with the guarantee to repair, restated in the language set forth in the footnote below.[5]

On February 15, 1962, Allis-Chalmers accepted Kaiser's purchase order and undertook to fabricate the motors. On July 15, 1962, Allis-

---

[4]The basic contract of the parties consisted of: 1) Kaiser's December 1, 1961, eight-page Request for Specifications; 2) Allis-Chalmers' January 3, 1962, 34-page Proposal and Contract; 3) Kaiser's January 29, 1962, Purchase Order incorporating the foregoing documents by reference; and 4) Allis-Chalmers' February 15, 1962, letter accepting the purchase order. The implied warranties quoted above were part of Kaiser's request for quotations, and then restated in Allis-Chalmers' proposal of January 3, Kaiser's purchase order and the subsequent documents. The first reference and·representation concerning the guaranteed temperature rise appeared in Allis-Chalmers' proposal.

[5]"GUARANTEE. All equipment furnished under this purchase order is hereby guaranteed against defects in material or workmanship for a period of one (1) year from the date of initial operation by Purchaser, or 18 months from date of shipment, whichever occurs first.

"The Seller hereby guarantees the performance of all said equipment in accordance with the requirements of applicable specifications for a period of one (1) year from the date of initial operation by Purchaser, or 18 months from date of shipment, whichever date occurs first.

"Should any part of said equipment fail to function or to meet the required performance as specified above, or should defects in materials or workmanship appear within the period specified above, Seller shall immediately make changes, corrections and/or additions, or authorize Purchaser or Owner to make such changes, corrections and/or additions as Purchaser or Owner deems necessary to fulfill the performance requirements of the specifications and/or to correct all such defects."

Chalmers forwarded to Kaiser the operating manual for the motors. This manual stated that the motors would have a temperature rise of 40° C. over an ambient temperature of 40° C. In the fall of 1962, Allis-Chalmers shipped the motors to Kaiser; both had affixed to them for future operating purposes a plate stating that the temperature rise would be 40° C. The motors were installed in the winter of 1962 and in the spring the testing and start-up of the motors and other equipment in the newly constructed plant began.

During this test period, Kaiser encountered numerous problems securing satisfactory performance from the motors and sent Allis-Chalmers a telegram outlining these difficulties. As to the temperature rise, the telegram stated: "In addition to above problem both Allis-Chalmers mill motors are running at excessive indicated temperature. 1000 horsepower motor at approximately 85° to 90° C. and 2500 horsepower at approximately 80° to 85° C. Please take any necessary steps toward resolution of problems and advise us immediately of your planned course of action regarding same. We are running short of patience, sleep, scotch tape and paperclips in our continuous campaign to keep your motor on the line."

After the telegram and during May 1963, Allis-Chalmers undertook certain repairs and modifications that resolved some of the problems of the motors. However, as to the temperature rise, Allis-Chalmers on June 11, 1963, sent a service representative and its motor design engineer, Mr. Richards, to inspect the motors. Richards orally advised Kaiser that the higher than expected temperature rise related to a simple ventilation problem but that the temperature rise of the motors was not exceeding the capabilities of the "B" insulation provided. Richards reassured Kaiser that the motors had no over-temperature problem.

On June 18, 1963, William B. Thompson, the Allis-Chalmers sales representative who had negotiated the transaction, wrote Kaiser that the motors required no repairs on its part with respect to the temperature rise problem. The letter further stated: "The motors were quoted as 40° C. rise by thermometer above a 40° C. ambient with Class 'A' insulation. The motors were designed and manufactured with Class 'B' insulation throughout; Silco-Flex in the stators, mica in the rotors which provides *a better motor* than Class 'A' machines. . . . It is cumbersome to rate machines on the basis of thermometer temperatures, and at the same time to have resistance temperatures installed for observation. We therefore are suggesting that this problem be resolved by us furnishing new name plates, carrying temperature rise ratings on the basis of winding temperature de-

tector readings rather than by thermometer. We are therefore sending . . . two new name plates stamped 80° C. rise by detector for installation on the machines. With the motors clean and with precautions taken to prevent air recirculation *there would still be a comfortable margin to allow operating flexibility.*" (Italics supplied.)

The letter indicates the complications involved in rating motors for temperature rise. Furthermore, the design of the motor did not permit the customer to monitor the temperature of both parts of the complex motor.

The only temperature indicator on the motors, the one on the stator, at no time disclosed temperature rises in excess of the 80° rating contained on the new name plates. No similar temperature indicators for the rotor are normally provided because of the complications of getting the information from a rotating part to a temperature indicator. Thus, there was no means for construction or plant operating personnel to determine the rotor temperature rise. Thus, it appeared to Kaiser, based on the only temperature indicator, that the re-rated motors were performing within the revised temperature ratings. On June 24, 1963, a Kaiser engineer wrote to Allis-Chalmers as follows: "I am still at somewhat of a loss as to the reason Allis-Chalmers rated these drives at 40° C. rise over a 40° C. ambient when Class 'B' insulation was supplied, which obviously has a much higher heat rating. However, as long as the motors are guaranteed for the temperature rise which these indicates continuously, our requirement is satisfied."

In August 1963, Kaiser received new plates for the motors that indicated a temperature rise of 80° as to the stators and 85° as to the rotors. As Kaiser could only observe the temperature rise indicated for the stators, and had no information concerning the temperature rise of the rotors, Kaiser relied on Allis-Chalmers re-rated temperature rise characteristics based on the new plates that indicated a temperature rise of 85° C. over an ambient temperature of 40° C. This rise was within the Class B insulation protection as outlined by the Allis-Chalmers letter of July 18, 1963.

On September 30, 1966, about 3½ years after the first testing of the motors, the rotors on the 2,500 h.p. motor suffered an electrical winding failure caused by insulation deterioration due to temperature rise in excess of the insulation protection provided by Allis-Chalmers. A subsequent inspection of the rotor windings on the 1,000 h.p. motor disclosed similar deterioration of the insulation.

Allis-Chalmers maintained that the motor failure was caused by Kaiser's

failure to provide adequate ventilation for the motors, although the motors were "self-ventilating." First, Kaiser retained the services of an electrical engineer who was not a specialized motor design expert, and erroneously accepted the Allis-Chalmers conclusion that the cause of the failure was ventilation. Then, Kaiser expended $9,214 on the installation of a forced ventilation system for the motors in February and March 1967. Only after the installation and testing of the ventilation system did Kaiser discover that this system did not significantly affect the temperature rise of the rotors and that ventilation was not the cause of the failure. Consequently, Kaiser did not serve its formal written notice of breach of warranty until March 8, 1967. The coils were rewound by a firm authorized to repair Allis-Chalmers motors and provided with the higher classification "F" insulation, and thereafter functioned in a satisfactory manner.

On February 5, 1968,[6] Kaiser filed its complaint in the instant action for negligence and breach of express and implied warranties. The gist of the action (as pled in the third, fourth, fifth, seventh and eighth causes of action) was the nonconformance of the re-rated motors to the prospective temperature rise warranties of July and August 1963. In view of the technical nature of the matter, the liability issue was bifurcated from the damage issue. On demand of Allis-Chalmers, the matter was tried by a jury.

On the basis of his examination of the coils that had failed and highly technical mathematical calculations, Kaiser's expert, Dr. Lee Kilgore, stated that the temperature rise of the rotors under normal operating conditions exceeded 200° C. in the specified areas of the rotors. An Allis-Chalmers insulation or winding expert also wrote a memorandum following his inspection of the coils that failed, stating that these coils had been subjected to a temperature rise of 200° C. According to Kilgore, the cause of the heat was a manufacturer's design defect that permitted the electrical heat to deteriorate the "B" insulation.

At trial, Allis-Chalmers maintained that the temperature problem was the result of inadequate ventilation. Subsequently, however, its own expert rejected the lack of proper ventilation as a cause of failure.[7] Allis-Chalmers then maintained that under the admitted facts, Kaiser was barred from recovery on a warranty theory by existence of the one-year warranty or guarantee to repair and further barred by statute of limitations, but offered

---

[6]This date is within two years from the September 30, 1966, failure, but more than four years from the date of any of the contract documents or the Allis-Chalmers letter of July 18, 1963.

[7]Allis-Chalmers also argued that the rotor damage was the result of operator misuse, but its own expert also abandoned this ground.

no jury instructions on these affirmative defenses pled in its answer. However, at the request of Allis-Chalmers, the jury was instructed on knowledge as it relates to prospective warranties, and Civil Code section 1791.

The jury returned a general verdict in favor of Kaiser and further found, on a special verdict, that Allis-Chalmers had breached the warranties, but was not negligent. Allis-Chalmers maintained it was entitled to prevail on its defense as a matter of law and filed motions for judgment notwithstanding the verdict and for a new trial. The trial court denied the motion for judgment notwithstanding the verdict but granted a new trial on the sole ground that the verdict is against the law as Kaiser's action was barred by the statute of limitations.

The trial court set forth the following specification of reasons for granting the new trial: "Plaintiff's cause of action is barred by the Statute of Limitations. Before submission of the case to the Jury, Counsel for plaintiff stipulated that the date of the breach of the guarantee was in May, 1963. Further, the evidence shows that discovery of the defect was in May, 1963. The Jury's Special Verdict was based upon a finding that there was a breach of warranty. In its Request for Quotation submitted by Plaintiff to Defendant, Plaintiff attached a printed form entitled *Terms and Conditions* (Exhibit B) as well as typewritten specifications (Plaintiff's Exhibit 9). Those specifications and the typewritten portions of the purchase order (Plaintiff's Exhibit 11), prepared by plaintiff, required defendant to and defendant did guarantee the motors sold to plaintiff against defects in workmanship and materials for one year from the date of initial operation or 18 months from date of shipment, whichever date occurred first."

The parties admit to uncertainty and confusion as to the inherent inconsistency between the order granting the new trial and the sole ground on which it was based. If all of Kaiser's causes of action for breach of warranty were barred by the statute of limitations, then there would be no purpose in granting a new trial. As indicated above, no instructions relating to the statute of limitations were submitted by Allis-Chalmers or given.

As to the stipulation, the record indicates that this was limited to Allis-Chalmers' breach of the warranty to repair in May 1963 and that Kaiser then gave notice of it. Kaiser's counsel carefully distinguished between the guarantee to repair and the other warranties. The trial court apparently accepted this distinction and subsequently gave Allis-Chalmers' requested instructions on prospective warranties and Civil Code section 1791, which implied that the admittedly breached guarantee to repair did not limit

Allis-Chalmers' liability under the other warranties. The new trial order is consistent with this approach, but also implies that the express warranty to repair within a year or 18 months superseded and negated all of the other implied warranties.

■ A verdict is "against the law" when it is contrary to the instructions given the jury. However, that a verdict is against the law or that it is not justified by the evidence are separate grounds for a new trial. An order granting a new trial on the ground the verdict is against the law cannot be stated by merely showing that it is unsupported by the evidence. It is possible to determine whether a verdict is contrary to an instruction only when the evidence on a point covered by the instruction is without conflict and fails to show a set of facts, which under the instruction, would warrant the verdict reached. ■ Where the evidence on that point is conflicting but sufficient to support a finding of fact under which the instruction warrants the verdict, it must be presumed that the jury would make such a finding and hence its verdict is not contrary to the instruction and not against the law (*Hawkinson* v. *Oesdean,* 61 Cal.App.2d 712, 717 [143 P.2d 967]).

■ As the evidence here was in conflict and sufficient to support the verdict, we turn next to the questions of whether the express warranty to repair negated the other implied warranties and whether, as the trial court concluded, the statute of limitations on Kaiser's breach of warranty causes of action ran from May 1963.

As indicated above, the trial court's specification of reasons for granting the new trial focused exclusively on the express warranty to repair in the basic contract documents and concluded that this warranty (which alone was the subject of the stipulation) superseded and negated the other implied warranties. The trial court's approach ignored the fact that the first reference to the "guaranteed temperature rise" occurred in Allis-Chalmers' proposal. Thus, under the basic contract documents, Allis-Chalmers extended three separate warranties: 1) the stator and rotor would operate within the guaranteed temperature rise standard; 2) the motors would be expressly and impliedly fit for its known purpose and of good merchantable quality. Quality was further defined as being of the highest degree of reliability and freedom of maintenance obtainable by existing fabrication methods; and 3) the warranty to repair. These were amended in July and August 1963, with the extension of the Allis-Chalmers' temperature rise guarantee to the future performance of the re-rated motors for temperature rises of 80°-85° C. As Allis-Chalmers in 1963 indicated that the motors

were not in need of repair for the temperature rise problem, that warranty was clearly breached at that time, as stipulated by the parties.

We do not think, however, that the admitted breach of the express warranty to repair absolved Allis-Chalmers of all future responsibility. Rather, the converse is true, since in failing to properly diagnose the problem and effect the proper repairs, Allis-Chalmers incurred legal liability for the natural consequences of its breach of the warranty to repair. In *Rose* v. *Chrysler Motors Corp.*, 212 Cal.App.2d 755 [28 Cal.Rptr. 185, 99 A.L.R.2d 1411], the express warranty to repair (unlike the warranty in the instant case) purported to expressly exclude and limit the manufacturer's liability as to all other warranties. The court held (at pp. 761-762) that even with its restrictive language excluding and limiting liability, the manufacturer's liability, the breach of the warranty to repair did not limit or exclude "the obligation which flows from nonperformance of the stated agreement to replace (or properly adjust); the law reads into the transaction the measure of damages prescribed by Civil Code section 1789, subdivision (6)—[8] '. . . the loss directly and naturally resulting in the ordinary course of events from the breach of the warranty.' " *Rose* was approved and followed in *Seely* v. *White Motor Co.*, 63 Cal.2d 9, 13-14 [45 Cal.Rptr. 17, 403 P.2d 145], where, as here, there was no inequality in the bargaining position of the parties.[9] *Rose* and *Seely* also indicate that the breach of the warranty to repair is separate and independently actionable from other warranties, such as those here relating to the temperature rise, fitness, merchantability and quality.

Furthermore, a reading of the guarantee here set forth in the warranty to repair, does not disclose any express language to exclude other remedies. As the contract expressly included several warranties separately stated, the only reasonable conclusion is that all were included for a meaningful purpose. No doubt the purpose of the limited guarantee to repair was to provide Allis-Chalmers with an opportunity to effect proper repairs at its own expense and thus limit its liability (*Seely* v. *White Motor Co., supra,* 63 Cal.2d 9, 13). The breached guarantee to repair cannot be used as a shield to protect Allis-Chalmers from the consequences of that breach or as a sword to destroy its liability based on other warranties.

[8]Now Commercial Code section 2714, subdivisions (1) and (2).

[9]Allis-Chalmers attempts to argue that the contract was one of adhesion, with it at the mercy of the buyer. Given the large size and national scope of the parties here and the negotiations relating to the transaction, revealed by the record, this contention borders on the frivolous.

In a somewhat similar situation, we held that "It is equally well settled that the substance of the express warranty does not in any way negate any of the implied warranties. . . ." (*Gherna* v. *Ford Motor Co.,* 246 Cal. App.2d 639, 652 [55 Cal.Rptr. 94]; *Gottsdanker* v. *Cutter Laboratories,* 182 Cal.App.2d 602, 610 [6 Cal.Rptr. 320, 79 A.L.R.2d 290].) "Where a contract expressly provides a remedy for a breach thereof, the language used in the contract must clearly indicate an intent to make the remedy exclusive" (*Nelson* v. *Spence,* 182 Cal.App.2d 493, 497 [6 Cal.Rptr. 312]; *Inner Shoe Tire Co.* v. *Tondro,* 83 Cal.App. 689, 694-695 [257 P. 211]; former Civ. Code, § 1791, now Com. Code, § 2719, subd. (b)).

We turn next to the question of whether the warranties relating to the performance of the motors were prospective. In *Aced* v. *Hobbs-Sesack Plumbing Co.,* 55 Cal.2d 573, 584 [12 Cal.Rptr. 257, 360 P.2d 897], our Supreme Court stated the principles of prospective warranties as follows: ". . . if a warranty relates to a future event before which the defect cannot be discovered by the exercise of reasonable diligence, the warranty, though accompanied by a representation as to present condition, is prospective in character and the statute of limitations begins to run as of the time of that event. . . . [T]he principle in question has been followed with respect to implied as well as express warranties, and it has long been recognized in this state that the time when the statute of limitations begins to run is the same whether a warranty is express or implied."

We approved this principle in *Mack* v. *Hugh W. Comstock Associates,* 225 Cal.App.2d 583, 589 [37 Cal.Rptr. 466]. ■ It is readily apparent from these cases that the doctrine of prospective warranties applies to a warranty that goods will operate in a specified fashion in the future when the breach of that warranty is not reasonably discoverable until the failure of the goods to so perform. In *Comstock,* we applied the rule to a radiant heating home system and indicated that both express and implied warranties of fitness could be prospective. In *Aced, supra,* our Supreme Court indicated that a warranty was prospective when it was not reasonably discoverable until a future event. The doctrine of prospective warranty has also found uniform acceptance in other jurisdictions and a variety of factual situations. Uniformly, the cases hold that the statute of limitations does not begin to run on execution of the contract or delivery or acceptance of the product but rather at the time the breach of the product to fulfill the standard could be reasonably discoverable by the purchaser. (*Southern Cal. Enterprises* v. *Walter & Co.,* 78 Cal.App.2d 750, 754 [178 P.2d 785]; 2 Rest., Contracts, § 412.)

■ In the instant case, the uncontroverted evidence indicated that the motors were specifically designed by Allis-Chalmers to be an integral part of Kaiser's new automated cement plant. In view of the size of Kaiser's investment and the dependence of the entire plant for continued operation on the motors, Kaiser relied on Allis-Chalmers to supply machines that would operate dependably for the expected 20-year period of time. Thus, the contract provided for a particular warranty of quality of the highest degree of reliability and freedom from maintenance obtainable by existing methods of fabrication. As the evidence established and the failure of the motors demonstrated temperature rise has a major effect on the reliability and life of the motors. Kaiser's telegram of May 7, 1963, brought the temperature rise to the attention of Allis-Chalmers and demonstrated Kaiser's concern that the future performance and life of the motors was possibly in danger. Allis-Chalmers subsequent rerating of the motors and explicit guarantee at the higher temperature specifically related to future performance, as Allis-Chalmers' letter of July 18 specifically stated "there still will be a comfortable margin to allow operating flexibility." Unknown to Kaiser, the rerating of the motors was in error as the rotor temperature rise exceeded the insulation protection.

The record indicates that Kaiser did not and could not reasonably have discovered the insulation defect until the failure of the motors in 1966. Before the failure it was impossible to measure temperature rise within the rotors as it was customary in the trade that rotors were not equipped with temperature rise monitors, like those available and provided for the stators. Other than the revised temperature information supplied by Allis-Chalmers, Kaiser had no information or means of determining the temperature rise before the failure. An external examination would not disclose the necessary information. Only the subsequent physical removal and dissection of the coils by a motor design expert could provide the necessary information. Thus, Kaiser was completely dependent on Allis-Chalmers' representations of the component parts of the rotors and the examinations made by Allis-Chalmers' expert in June 1963, as well as on the truthfulness of the revised temperature ratings of July and August 1963.

As the only temperature monitoring device attached to each motor related solely to the stators, the monitoring device did not disclose the temperature rise in the rotors and the stator reading was no indication of a corresponding condition in the rotors. Furthermore, neither motor ever suffered a stator failure and the stator of both motors at all times were within the "B" insulation standard. Thus, Kaiser accepted the motors in

July 1963 with the comfortable margin to allow operating flexibility and with the continuing guarantee. Furthermore, even after the failure and during the trial, Allis-Chalmers insisted that the cause of the failure was some type of ventilation problem. Only after the February and March 1967 installation of the forced ventilation system did Kaiser discover that this system did not significantly affect the temperature rise of the rotors and that ventilation was not the cause of the failure.

Clearly, the jury here was properly instructed on knowledge as applied to prospective warranty. The jury found as a question of fact that the express warranty did not exclude the implied warranties. It follows that Kaiser's formal written notice of breach of warranty of March 8, 1967, was timely, and that Kaiser's action was timely filed. Thus, the verdict was not "against the law" and the trial court erred in granting a new trial on the sole ground that the statute of limitations began to run in May 1963.

■ Allis-Chalmers, however, urges that a new trial is essential as no proper foundation was laid for the testimony of Kaiser's expert Kilgore as to the continued possession of the burnt-out rotor coils that he examined. The record indicates that this evidentiary issue was not raised by either of Allis-Chalmers' memoranda in support of its motion for a new trial, and was clearly not a basis for the new trial order. Although we need not discuss the matter, we merely note that the record does not support the contention.

We turn finally to the Allis-Chalmers appeal from the order denying its motion for a judgment notwithstanding the verdict. As indicated above, there was substantial evidence in support of the verdict in favor of Kaiser on its causes of action for breach of warranty. ■ A directed verdict or judgment notwithstanding the verdict may be sustained only when it can be said as a matter of law[10] that no other reasonable conclusion is legally deducible from the evidence (*Spillman* v. *City etc. of San Francisco,* 252 Cal.App.2d 782, 786 [60 Cal.Rptr. 809]; Code Civ. Proc., § 629). Accordingly, the order denying the motion is affirmed.

Our examination of the record herein shows that the order granting the new trial on the ground that the verdict is against the law cannot be sustained, and must be reversed. The matter is remanded with instructions

---

[10] Allis-Chalmers' contentions that Kaiser's warranty causes of action were barred by the express warranty or the statute of limitations have been discussed above.

to enter judgment in favor of Kaiser on the issue of liability and to try the issue of damages.[11] Kaiser awarded costs on appeal.

Kane, J., and Rouse, J., concurred.

---

[11]As indicated, the original proceedings were bifurcated and only the liability issue tried.