543 S.E.2d 245

**TRIPLE E, INC., Respondent,**

v.

**HENDRIX AND DAIL, INC., Appellant.**

**No. 3285.**

Court of Appeals of South Carolina.

Heard Dec. 12, 2000.

Decided Jan. 16, 2001.

Rehearing Denied March 12, 2001.

---

10.  Because we reverse on this issue, we need not reach First Palmetto's remaining arguments.

Arthur K. Aiken, Hammer, Hammer, Carrigg & Potterfield, Rebecca M. Monroy, Collins & Lacy, Columbia, William P. Hatfield, The Hyman Law Firm, Florence, for appellant.

W.E. Jenkinson, III, Jennifer R. Kellahan, Jenkinson & Jenkinson, Kingstree, for respondent.

GOOLSBY, Judge:

Triple E filed this action against Hendrix and Dail, Inc. (H & D), alleging breach of express warranty, breach of implied warranty of fitness for a particular purpose, breach of implied warranty of merchantability, negligent misrepresentation and negligence. The jury returned a verdict of $47,025 for Triple E. H & D appeals. We affirm.

## FACTS

Triple E is a family farm operated primarily by Marty Easler. In the early 1990s, Triple E's principal crop was tobacco. In 1994, Triple E purchased 8,000 pounds of Chlor–O–Pic.[1] Chlor–O–Pic is a chemical fumigant used to suppress black shank disease. Black shank disease is a soil-boring fungal disease that destroys tobacco crops.

Easler purchased Chlor–O–Pic after seeing full and half-page advertisements in the *Carolina Farmer*, a trade magazine. The advertisements pictured a pair of dice and stated: "Why gamble on your crop when you can insure it with Chlor–O–Pic?" The ads further stated: "Proven control . . . University tests prove that for consistent, effective control of Granville Wilt and Black Shank, you need 42 pounds of active ingredient . . . at 3 gallons per acre. . . . Chlor–O–Pic gives you season long control with application in fall, winter or spring."

Easler used Chlor–O–Pic to treat approximately 143 acres of his tobacco crop. Easler testified he applied the Chlor–O–Pic using the correct machinery, with the correct application procedures, and in the correct amount. Nevertheless, Triple E's crop developed black shank. Triple E eventually lost ten acres, or an estimated 3,000 pounds of tobacco per acre, to black shank.

At a trial held in 1994, Easler called J.K. McCord as an expert witness in agricultural chemicals.[2] When asked about H & D's ad for Chlor–O–Pic, McCord testified the ad was

---

1. Chlor–O–Pic is a tradename under which the pesticide chloropicrin is sold.

2. McCord viewed Easler's damaged tobacco fields and determined they contained a moderate incident of black shank.

"vulgar" because it was misleading by using the term "proven control." McCord testified chloropicrin was a good product for suppression, but if applied as described in the ads, it could not control black shank throughout a growing season, contrary to the ad's claims. McCord testified a farmer needed to apply chloropicrin as directed in the ads, but also needed to supplement it with sufficient quantities of Ridomil twice during the season. McCord testified Easler told him he had applied a small amount of Ridomil once during the season, but McCord testified that the amount Easler used was insufficient to combat black shank.

Easler testified that in the farming world, the word control "is a real strong word" meaning prevention. Easler testified he believed the ad to mean that Chlor–O–Pic would prevent his crop from getting black shank. Easler testified he relied on the ad's claims when purchasing Chlor–O–Pic from H & D and that he placed great reliance on the ad because the *Carolina Farmer* was a trade publication. He stated that the ad's use of the words or phrases "control," "season long control," and "why gamble ... when you can insure ..." all led him to believe that Chlor–O–Pic would prevent black shank the entire growing season.

At the close of Triple E's case, H & D moved for a directed verdict on all causes of action. The trial judge denied the motion and submitted the case to the jury. The jury found for Triple E on all causes of action and returned a general verdict in the amount of $47,025. The trial judge denied H & D's post-trial motion for judgment notwithstanding the verdict.

### Standard of Review

In an action at law, on appeal of a case tried by a jury, this court will correct errors of law and will not disturb a factual finding of the jury unless a review of the record discloses no evidence to reasonably support the jury's findings.[3] In reviewing motions for a directed verdict and for judgment notwithstanding the verdict, it is the duty of this court to view the evidence and all inferences that may reasonably be drawn therefrom in the light most favorable to the

---

**3.** *Townes Assocs., Ltd. v. City of Greenville,* 266 S.C. 81, 221 S.E.2d 773 (1976).

nonmoving party.[4]  If more than one reasonable inference can be drawn from the evidence, the case must be submitted to the jury.[5]

■ Additionally, this court may review an order on appeal under the "two issue" rule when the jury returns a general verdict involving two or more issues.  If the jury's verdict is supported as to at least one issue, the verdict will not be reversed on appeal.[6]

## LAW/ANALYSIS

■ H & D argues the trial judge erred in finding a question of fact existed as to whether the advertisements in the *Carolina Farmer* constituted an express warranty.  We disagree.

■ This action is governed by the Uniform Commercial Code (UCC), codified in Chapter 36 of our code.[7]  Section 36–2–313 of the UCC states in relevant part:

(1) Express warranties by the seller are created as follows:

(a) Any affirmation of fact or promise, including those on containers or labels, made by the seller to the buyer, whether directly or indirectly, which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

. . .

---

4.  *Woodward v. Todd*, 270 S.C. 82, 240 S.E.2d 641 (1978).

5.  *Easler v. Pappas*, 252 S.C. 398, 166 S.E.2d 808 (1969).

6.  *Anderson v. South Carolina Dep't of Highways & Pub. Transp.*, 322 S.C. 417, 472 S.E.2d 253 (1996) (stating under one of the applications of the "two issue" rule, the appellate court will find it unnecessary to address all the grounds appealed where one requires affirmance).

7.  *See* S.C.Code Ann. § 36–2–102 (1976) (stating the UCC applies to transactions in goods); *Id.* § 36–2–105(1) (defining goods as all things movable at the time of identification to the contract for sale).

(2) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.[8]

Whether an affirmation creates an express warranty or is merely the seller's opinion or puffing is ordinarily a question of fact for the jury.[9]

Although we have found no South Carolina case in which an advertisement created an express warranty, in *Odom v. Ford Motor Company*[10] our supreme court stated: "There are cases where recovery has been allowed on the theory of express warranty ... where the purchaser of an article relied on representations made by the manufacturer in advertising material."[11] Moreover, other jurisdictions have held that affirmations made in advertisements can give rise to express warranties.[12]

---

**8.** S.C.Code Ann. § 36–2–313. *See also Fields v. Melrose Ltd. Partnership*, 312 S.C. 102, 105, 439 S.E.2d 283, 284 (Ct.App.1993) ("A warranty is created when the seller makes an affirmation with respect to the thing to be sold with the intention that the buyer shall rely on it in making the purchase.") (citation omitted).

**9.** *See Marshall and Williams Co. v. General Fibers and Fabrics, Inc.*, 270 S.C. 247, 250, 241 S.E.2d 888, 889 (1978) ("Our sole concern is whether there was any evidence from which the jury might conclude that there was an express warranty which was breached."); 67A Am.Jur.2d *Sales* § 729 (1985).

**10.** 230 S.C. 320, 95 S.E.2d 601 (1956).

**11.** *Id.* at 328, 95 S.E.2d at 605.

**12.** *See Gherna v. Ford Motor Co.*, 246 Cal.App.2d 639, 55 Cal.Rptr. 94 (1966) (stating advertisement can give rise to an express warranty); *Torres v. Northwest Eng'g Co.*, 86 Hawai'i 383, 949 P.2d 1004 (1997) (recognizing that an advertisement can create an express warranty); *Scheuler v. Aamco Transmissions, Inc.*, 1 Kan.App.2d 525, 571 P.2d 48 (1977) (holding that an advertisement can create an express warranty); *Courtney v. Bassano*, 733 A.2d 973 (Me.1999) (advertisement stating table was "all original" created express warranty); *Interco, Inc. v. Randustrial Corp.*, 533 S.W.2d 257 (Mo.Ct.App.1976) (holding that advertisement can create an express warranty); *Daughtrey v. Ashe*, 243 Va. 73, 413 S.E.2d 336 (1992) (noting that any description of the goods,

In the present case, Triple E presented evidence that the assertions expressed in the advertisement met the definition of an express warranty. Easler and McCord testified the words "proven control" constituted an affirmative statement in the farming community. The ads stated that Chlor–O–Pic would provide "season long control," a fact disputed by Triple E's expert. Easler testified he saw the ads and relied on them in purchasing Chlor–O–Pic. Finally, Mr. McLawhorn, an agent of H & D, admitted they intended the slogan "Why gamble on your crops when you can insure it with Chlor–O–Pic?" to convey the message as stated.

Viewing the evidence in the light most favorable to Triple E, we find sufficient evidence in the record to support the trial judge's conclusion that the issue of the express warranty was one for the jury. Because the jury verdict is supported as to this issue, we decline to address the jury's verdict on the remaining causes of action.

■ H & D next argues that Triple E's recovery is limited by H & D's exclusion of consequential and incidental damages.

Under South Carolina Code section 36–2–719,[13] parties may contractually modify or limit the recovery of consequential or incidental damages, provided the limitation is not unconscionable. Accordingly, where a proper exclusion of consequential and incidental damages is contractually agreed to, a plaintiff's remedy is limited to his or her actual damages as defined in South Carolina Code section 36–2–714(2).

South Carolina Code section 36–2–714(2) states:

(2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have

---

other than the seller's opinion, constitutes a basis of the bargain and is therefore an express warranty); *Arrow Transp. Co. v. A.O. Smith Co.,* 75 Wash.2d 843, 454 P.2d 387 (1969) (recognizing that an advertisement can create an express warranty); *see also* R.D. Hursh, Annotation, *Statements in Advertisements as Affecting Manufacturer's or Seller's Liability for Injury Caused by Product Sold,* 75 A.L.R.2d 112 (1961); 67A Am.Jur.2d *Sales* § 728 (1985).

**13.** S.C.Code Ann. § 36–2–719 (1976).

had if they had been as warranted, unless special circumstances show proximate damages of a different amount.[14]

H & D contend that because the parties contractually agreed to exclude consequential and incidental damages under section 36–2–714, Triple E is entitled to recover only the cost of the Chlor–O–Pic. We disagree.

In *Hill v. BASF Wyandotte Corporation*,[15] our supreme court rejected a similar argument, stating:

This formula [under section 36–2–714(2) ] is most appropriate where the nonconforming good can be repaired or replaced and value (both as warranted and as accepted) can be defined with certainty.

A herbicide failure is a latent defect in the product. There is no reasonable way a farmer can determine in advance whether a herbicide will perform as warranted. Discovery of the problem must await the development of the crop at which time it is usually too late to correct.

. . .

It has consistently been held by this Court that the measure of *actual damages,* in cases similar to this, is the value the crop would have had if the product had conformed to the warranty less the value of the crop actually produced, less the expense of preparing for market the portion of the probable crop prevented from maturing.

. . .

If the measure of damages we have adopted includes an element of lost profits, such inclusion is merely coincidental as the measure covers the direct loss resulting in the ordinary course of events from the alleged breach of the warranty.[16]

Thus, under *Hill,* Triple E was entitled to recover the value of the damaged crop.

**AFFIRMED.**

CURETON and CONNOR, JJ., concur.

---

14. *Id.* § 36–2–714(2).

15. 280 S.C. 174, 311 S.E.2d 734 (1984).

16. *Id.* at 177–78, 311 S.E.2d at 735–36 (citations omitted) (emphasis added).