IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| RICHARD J. MILLIES, as a trustee of the Richard J. Millies Trust, and SUSAN P MILLIES, as trustee of the Susan P Millies Trust, | ) ) ) ) | No. 31521-5-III |
| | ) | |
| Appellants, | ) ) | |
| | ) | UNPUBLISHED OPINION |
| vs. | ) ) | |
| LANDAMERICA TRANSNATION d b a TRANSNATION TITLE INSURANCE COMPANY, a corporation conducting business in Washington, and FALCON, INC, an Idaho corporation conducting business in Washington, | ) ) ) ) ) ) ) | |
| | ) | |
| Respondents. | ) | |

FEARING, J. — A jury awarded appellants Richard and Susan Millies nothing. The undisputed facts show, however, that the Millies are owed at least $25,000 by LandAmerica Transnation d/b/a Transnation Title Insurance Company (Transnation). We wish we could award this sum to the Millies, but court rules and legal precedent demand otherwisebecause of the manner in which the case was tried before the jury. We affirm the jury verdict and the trial court's denial of the Millies' posttrial motions.

After obtaining a title commitment from Transnation, Richard and Susan Millies, through a trust, purchased a 75-acre parcel on Deer Lake and a title insurance policy. After the purchase, the Millies learned Transnation failed to discover a 1955 easement bisecting their property. Transnation accepted responsibility and offered the Millies $25,000 to offset the property's diminished value. The Millies objected and demanded over $100,000. When Transnation rejected the Millies' demand, the Millies filed suit, claiming breach of contract and violation of duties under Washington insurance regulations. Transnation demurred, contending it fulfilled the terms of its contract and violated no duty. The jury agreed with Transnation and awarded the Millies nothing.

Richard and Susan Millies argued before the trial court and now on appeal that the court erred in instructing the jury that fulfillment of a contract is a defense to breach of contract. The Millies also seek judgment as a matter of law or a new trial.

## FACTS

Richard and Susan Millies were Department of Defense career professionals residing in Washington, D.C. In 2006, the Millies sought to purchase property in the West on which to build their retirement home. They searched diligently for property that offered privacy, solitude, quietude, security, nature, and scenic views. Privacy was paramount. The Millies rejected properties that had public-rights-of-way bisecting them.

In August 2006, Richard and Susan Millies located a 75-acre parcel, overlooking Deer Lake in Stevens County, which fulfilled their criteria. After retaining Columbia

Title Company to research the title, the Millies acquired title insurance from Transnation Title Insurance Company and purchased the property for $250,000. The policy listed no exception for any easement favoring a neighbor.

In September 2006, Richard and Susan Millies learned the adjoining property owner to the north, Darold Sauer, held a 1955 recorded easement over a road bisecting their property. According to the Millies, Sauer intended to widen the road to access a condominium complex he planned on his land. The easement runs across the west-facing slope of the Millies' property, in the middle of the prime view shed where the Millies planned to build their retirement home. Richard Millies complained that the easement and its intended use constitutes "a near complete destruction" of the couple's use and enjoyment of the Deer Lake property. Clerk's Papers (CP) at 338. At the time of trial, another owner had acquired the neighboring property and no condominiums had been built.

After their encounter with Darold Sauer, the Millies contacted Columbia Title Company, the broker for Transnation. Columbia Title Company identified the easement bisecting their property and suggested the couple file a claim. On March 28, 2007, Columbia Title Company wrote Transnation and informed the title insurance company that it discovered an easement not previously disclosed.

On April 24, 2007, Transnation Claims Representative Donna LaRocca contacted the Millies' counsel requesting he file any claim with her and explain what the "Millies

3

see as a loss to them." CP at 250. On July 16, 2007, the Millies' counsel responded:

> [T]he Millies determined they would retire out West on a large parcel with suitable access to recreational opportunities and, importantly, protections for their privacy and quietude. . . . In 2006 they visited several properties in eastern Washington based on a listing of available parcels provided by their real estate agent. However, they decided against even visiting one of the listed parcels when they learned that a public right-of-way bisected the property. They also immediately rejected a second parcel upon arriving at the property and hearing the traffic noise from a nearby public road. In the course of their investigations, the real estate agent increasingly developed an understanding of the Millies' deep respect and regard for the property attributes they sought. Eventually, they discovered the property which forms the subject of this claim—a 73-acre piece with beautiful and dramatic views of Deer Lake, a suitable building site near the top of a ridge and deeded waterfront access privileges. The Millies' dream retirement home vision included the prospects of summer-long visits with their grandchildren in the new house they had planned to have built on the property and enjoying the lake itself and the area's recreational opportunities, peaceably.

CP at 251-52. Counsel concluded his letter: "[F]or all of the injury they have suffered actually and anticipatorily, to an extent which may not be limited, we feel the Millies appropriately peg the value of the claim at 50% of the purchase price, or $125,000.00." CP at 253.

On July 19, 2007, Transnation Claims Representative Donna LaRocca acknowledged receipt of the Millies' claim letter, explained that she would review the facts, evaluate the loss, and respond within 30 days. On August 17, 2007, Donna LaRocca, on behalf of Transnation further acknowledged the Millies' claim and requested additional information. Transnation rejected the 50 percent claimed loss and

asserted the policy dictated the measurement of their damages. The insurer claimed,

"The standard method for determining the difference in value caused by a title defect

such as the subject easement, is to hire an MAI appraiser to conduct a diminution-in-

value (DIV) appraisal." CP at 255.

Donna LaRocca's August 17 letter accepted coverage under the title policy.

LaRocca wrote to the Millies' counsel:

> In light of the fact that the 1955 easement was of record but was
> not found in the title examination, it does not come under the Standard
> Exception 3 in Schedule B, and the actual loss or damage suffered by
> the insured related to the easement, as defined under the policy
> provisions, is covered under the policy.
> . . . Pursuant to those provisions, Transnation Title Insurance
> Company (TTIC) has a number of options, specifically listed in
> Section 6 of the Conditions and Stipulations, "Options To Pay Or
> Otherwise Settle Claims; Termination Of Liability", in order to settle
> this claim.
> Briefly, those options include: 6(a) to pay the amount of
> insurance; or 6(b)(i) to pay or otherwise settle with parties other than
> the insured; or 6(b)(ii) to pay the insured for the loss or damage.
> Based on the information I have at this time, being this is not a total
> failure of title, 6(a) does not apply. Further, given his future plans for
> the land, the beneficiary of the easement is unlikely to consider giving
> up his rights therein, making a resolution under 6(b)(i) unlikely. That
> leaves 6(b)(ii), compensating them for the loss or damage pursuant to
> the policy.

Ex. at 2.

On September 18, 2007, Transnation retained Auble, Jolicoeur & Gentry (AJG) to

conduct a diminution-in-value appraisal of the Millies' property. Jason J. Kostelecky and

Bruce Jolicoeur appraised the Millies' land on behalf of AJG. At the time, Kostelecky was a trainee, not yet a Certified General Appraiser. The two appraisers certified that the encumbrance reduced the value of the Millies' property by $25,000, by using a matched-pair or comparable analysis. "A matched pair is defined as two sales properties that are similar in all respects, save one." CP at 179. The price differential between the sales of those properties equals the value or cost of the dissimilarity, in this case the easement. This analysis determines the hypothetical value a typical market participant would pay for the land with the encumbrance; it does not take into consideration the loss in value the Millies suffered.

Jason Kostelecky found comparable properties that resembled the Millies' land in location and size. Kostelecky divided those properties into three classes based on size. The first class contained only one parcel and was two to seven acre parcels in size. The property in that class had a value 41.32 percent less on a per acre basis because of the easement running through it. If one only compared this class of parcels to the Millies' land, the easement would reduce the Millies' property by 41.32 percent or $103,300.

The second class of comparable properties ranged from 7 to 15 acres. Jason Kostelecky discovered a parcel encumbered with an easement that sold for a higher price than an adjacent parcel without an easement. Jason Kostelecky considered the increase strange, but, when reaching his overall conclusion of damage to the Millies, he considered that the easement on the one parcel caused no reduction in value. Later,

6

another appraiser discovered the sale of the encumbered parcel was not an arms-length transaction, but a transaction structured to obtain financing.

The third class of comparable properties ranged from 15 to 25 acres. Land in this class lost 33.33 percent of its value on a per acre basis because of a road easement. After averaging or combining the percentage losses in the three classes of parcels, Jason Kostelecky concluded the easement reduced the value of the Millies' property by $25,000.

On November 13, 2007, Transnation wrote Millies' counsel and offered to pay the Millies the sum of $25,000 based on the diminution-in-value appraisal report completed by AJG. Transnation requested the Millies submit a proof of loss, if they rejected the offer.

On February 4, 2008, the Millies rejected Transnation's offer. The Millies argued the appraisal neglected to consider the additional traffic on the road since Stevens County lifted its moratorium on development. In addition, the Millies argued the appraiser failed to explain how it arrived at its 10 percent reduction in value. Accordingly, the Millies submitted a formal proof of loss, requesting $100,000.

At the request of Transnation, Auble, Jolicouer & Gentry answered the criticisms raised by the Millies. AJG ignored the increased traffic flow stemming from Stevens County's decision to permit additional subdivisions, since the diminution-in-value of the land is based on the value of the land at the time of the 2006 purchase, not at the time of

7

the claim. The Millies or any other purchaser could not have foreseen the later lifting of the moratorium. AJG explained to Transnation that it based its 10 percent reduction in the value of the land on qualitative and quantitative analysis.

On May 13, 2008, Transnation wrote again to Millies' counsel and informed him that it asked its appraiser to "give careful consideration to the points made in your letter, and to adjust his evaluation of the total loss, in the event he believed there was need to do so." CP at 269. Transnation stated that the appraiser stood by his determination of the loss at $25,000.

On September 25, 2008, the Millies again requested $100,000 to settle the claim. On June 30, 2009, the Millies, as required under RCW 48.30.015(8)(a), provided written notice to Transnation that they intended to file suit for unreasonably denying their claim and for unfair claims settlement practices. On July 7, 2009, Transnation requested additional information about the Millies' claim.

On July 31, 2009, Transnation sent the Millies a check in the amount of $25,000 to compensate them for their loss. On August 4, 2009, the Millies rejected Transnation's offer and returned the $25,000 check.

## PROCEDURE

On August 11, 2009, Richard and Susan Millies filed a complaint in Stevens County Superior Court, alleging Transnation breached its contract and duties under Washington State insurance statutes and regulations. In its answer, Transnation denied

8

liability and responsibility for damages due to the undisclosed easement. It also denied

breaching the insurance contract. As an affirmative defense, Transnation asserted it

fulfilled the terms of its contract by investigating the Millies' claim and tendering

payment of $25,000 in a timely manner based on a reasonable fair market appraisal.

Transnation hired a second appraiser to support its position. The appraiser,

Stanley Moe, opined that the easement reduced the value of the Millies property by

$37,500. Moe, however, discovered that one comparable sale used by AJG in its

appraisal was not an arm's length transaction.

On January 28, 2013, Transnation moved to bifurcate, for trial, the breach of

contract and bad faith claims. Richard and Susan Millies opposed the motion because

they anticipated Transnation's defense would be that it complied with the contract in

good faith. The trial court denied Transnation's motion because the evidence overlapped

and the court did not foresee any jury confusion.

In their pretrial memorandum, the Millies argued Transnation breached its

insurance contract with them. In the section addressing how Transnation breached its

contract, the Millies argued:

> Every contract carries with it an implied duty to act in good faith
> which obligates parties to cooperate with each other so that each may
> obtain the full benefit of performance. *Badgett v. Security State Bank*, 116
> Wn.2d 563, 569, 807 P.2d 356 (1991). This duty requires an insurer to
> conduct a reasonable investigation. It must base any decision on adequate
> information and not overemphasize its own interest. *Coventry v. American
> States Ins. Co.*, 136 Wn.2d 269, 281, 961 P.2d 933 (1988); WAC 284-30-

9

330(4). If it doesn't, it will have breached the covenant and, therefore, the policy. *Id.*[2]

CP at 355. In footnote 2, the Millies argued "A breach of contract action against an insurer is a separate cause of action and the jury in this case should be instructed separately on this claim. *Coventry*, supra [at] 278 (plaintiff may simultaneously bring both)." CP at 355. This footnote, the Millies argue on appeal, preserved their objection to jury instruction number 7.

Trial began on January 28, 2013. On January 29, 2013, the Millies called to testify real estate appraiser Terry Savage. Savage conducted a diminution-in-value analysis on their property. After reviewing the AJG report, analyzing comparable sales, and conducting his own analysis, Savage concluded the unrecorded easement diminished the property's value by 50 percent or $125,000.

Appraiser Terry Savage testified that one of the pairs AJG used to analyze the diminished value to the Millies property was not a bona fide sale. That sale consisted of the sale of two properties structured to look like one sale for the purpose of obtaining financing from a bank. AJG used the inflated price from the purchase of the property to erroneously conclude that an easement increased the value of the land.

During his testimony, Terry Savage also criticized Transnation's second appraisal report written by Stanley Moe. According to Savage, Moe substituted as a comparable land on Priest Lake, Idaho, with the transaction not at arms-length. Savage belittled

Moe's use of the Priest Lake property because it is not on the lake or a river and no easement encumbers it.

The Millies called Attorney Patrick LePley to testify about good faith in the insurance industry. LePley testified that the Insurance Fair Conduct Act, (IFCA) ch. 48.30 RCW, which he drafted, is designed to deter insurance companies from acting unreasonably when settling claims. After a lengthy hypothetical question that traced the history of the Millies' claim, LePley addressed whether he believed Transnation acted reasonably. LePley did not believe so. He opined that Transnation's repeated attempts to settle at $25,000 were not good faith attempts to resolve the claim given that the Millies rejected that offer a number of times.

Transnation opened its defense by calling Bruce Jolicoeur to testify about AJG's appraisal of the Millies' property. Jolicoeur agreed the market price of the Millies' property before discovering this easement was $250,000. He testified the easement reduced the value of the Millies' property by $25,000. He agreed that AJG did not consider, in its appraisal, the increased traffic that may use the road since development regulations in Stevens County prohibited condominiums north of the Millies' property at the time of the couple's purchase. According to Jolicoeur, even if the Millies knew of the easement when they purchased the property in 2006, they could not have known the amount of traffic that may use it.

Stevens County Planner Jenni Anderson testified that the property owner to the

north of the Millies never applied to subdivide his lot. She further stated that, as of the time the Millies purchased their lot, the Stevens County Zoning Ordinance would permit only one home for every 20 acres in the neighborhood.

Transnation called its claims representative Donna LaRocca to testify. LaRocca repeatedly testified that Transnation accepted the claim, meaning the loss the Millies suffered was covered by the policy they purchased. She stated:

> A    It was definitely covered by the policy.
> . . . .
> Q    Yeah.
> A    "Because the easement is of record but was not excepted from coverage in the Millies' policy they have coverage for actual monetary loss or damage suffered from the existence of the title defect"—which is the easement in this case—"Pursuant to the policy's provisions the loss is determined to be the difference in value between the property with the defect of the easement and the value of the property without it. Once that difference is determined by your appraisal TransNation will off that—that amount as settlement to the insured for their loss." That was how we always did it.

Report of Proceedings (RP) at 190, 197-98.

> Q    Right. And then,—the conclusion in the report as you recall is $25,000 loss, right?
> A    Yes.

RP at 199. LaRocca continued:

> Because it's still an easement. Somebody's got access across their property. Whether that's 700 people or 7,000 people. But it's still an access that's going to affect their property value. And obviously anyone who has the right to use an easement can have guests come across sometimes. So it's—you don't know how many are going to use it.

RP at 215.

Transnation's second appraiser Stanley Moe testified that the encumbrance reduced the value of the Millies' property by 15 percent or $37,500. Moe used the same matched pairs that AJG employed, but made different adjustments to the property based on their similarity or lack of similarity to the Millies' property. Moe characterized AJG's use of the non-bona fide sale unreasonable.

The parties dispute whether the easement bisecting the Millies' land constituted a public road. While acknowledging that the easement permitted the grantee who owned the lot to the north to make the road accessible to the public, Stanley Moe explained that the property adjoining the Millies to the south had no right of access across the Millies' land. Therefore, the public has no way of accessing the public road bisecting the Millies property.

To rebut attorney Patrick LePley's testimony, Transnation called attorney Peter Marchel to testify. Marchel practiced in the insurance industry for over 20 years. Marchel, after reviewing the time and substance of Transnation's responses to Richard and Susan Millies, opined that Transnation acted reasonably and in good faith. Transnation replied within weeks of receiving the Millies' claim. Transnation admitted liability within 30 days and retained an independent appraiser to evaluate the damage. Transnation shared the appraiser's report and offered the full amount to the Millies. When the Millies objected to the appraisal report, Transnation asked the appraiser to

13

revisit the report and change its number if it saw fit to do so. The appraiser did not and

Transnation, relying on the appraiser, offered the diminution-in-value. Transnation

communicated information, Marchel testified, in a reasonable period of time.

Near the conclusion of trial, the parties proffered proposed jury instructions. Both

the Millies and Transnation offered their own breach of contract instruction based on 6A

*Washington Practice: Washington Pattern Jury Instructions: Civil* 300.02 at 186 (6th ed.

2012) (WPI). The Millies proposed instruction read:

## PROPOSED JURY INSTRUCTION NO.___

The plaintiffs Millies have the burden of proving each of the
following propositions on their claim of breach of contract:
(1) That the defendant, [Transnation], entered into a contract with
plaintiffs Millies;
(2) That the terms of the contract included: The Millies recover
damages for the difference in value of their property as a result of the title
defect;
(3) That defendant breached the contract in one or more of the ways
claimed by the Millies;
(4) That the Millies were not in material breach of the contract;
(5) That the Millies were damaged as a result of defendant's
breach[.]
If you find from your consideration of all the evidence that each of
these propositions has been proved, your verdict should be for the Millies
on this claim. On the other hand, if any of these propositions has not been
proved, your verdict should be for defendant on this claim.

CP at 463. Transnation's proposed instruction read similarly but also included an

affirmative defense, which recited:

14

On the other hand, if each of these propositions has been proved, then you must also consider the affirmative defense claimed by the Defendant.

Defendant has the burden of proving the following affirmative defense:

(1) That Defendant fulfilled the terms of the contract with Plaintiffs by investigating the claim and tendering payment in a timely manner based on a reasonable fair market appraisal.

If you find from your consideration of all the evidence that this affirmative defense has been proved, your verdict should be for Defendant on this claim. On the other hand, if this affirmative defense has not been proved, then your verdict should be for Plaintiffs on this claim.

CP at 407.

During the late afternoon and early evening on January 30, 2013, the trial court held a jury instruction conference off the record. On the morning of January 31, the court proposed to hear exceptions to the instructions on the record after the jury began deliberations in order to afford ample time for the exceptions. The parties agreed. After closing arguments, on January 31, the trial court instructed the jury. The court gave the instruction Transnation offered concerning a breach of contract.

The parties recited exceptions to the jury instructions as the jury deliberated. The Millies objected to an instruction on contributory negligence and no other court instruction. The Millies also objected to the trial court's refusal to render all of their proposed instructions not given by the court. Their objection did not identify numbers of their proposed jury instructions. The ground given for the general objection was that the

15

Millies' instructions correctly stated the law. During exceptions, the Millies did not explain the relevance of any of their proposed instructions.

During deliberations, the jury sent the court an inquiry asking: "Can we make a recommendation about the settlement amount separate from the verdict form?" CP at 497. The court responded, "please refer to the Court's instructions." CP at 497. An hour later, the jury returned its verdict. The jury found Transnation did not breach its contract with the Millies, did not act in bad faith, did not act negligently, and did not violate the Consumer Protection Act (CPA), ch. 19.86 RCW. The jury awarded the Millies no money.

Richard and Susan Millies moved the court for a new trial. In support of their motion, the Millies submitted declarations from jurors Rick Horton, Tom Hale, and Allyson Burlington. Both averred that all jurors agreed that the Millies were entitled to some award of damages. Horton and Hale also declared that each believed Transnation violated at least one provision of state law because claims administrator Donna LaRocca asserted Transnation's right to conduct an appraisal before making a good faith effort to settle the Millies' claim. The majority of jurors, Horton and Hale testified, disregarded the court's instructions because the instructions were "stupid law" or because "It didn't make sense." CP at 521, 528.

The declarations of Tom Hale and Rick Horton state in substantial part:

16

Additionally, all of the jurors in the case agreed that the difference in value appraisal submitted by Auble, Jolicoeur & Gentry showing a ten percent loss in value to the property was defective and unreasonable because of matched pair #1, which concluded that the title defect on the Millies' property actually added value to it. Along with other jurors, like Tom Hale [Rick Horton], I contended that this constituted a failure by the insurance company to conduct a reasonable investigation also set out in Instruction #9 as a violation of law. The majority of the jury, however, determined that, while the investigation was unreasonable, its unreasonableness could not be extended to the insurance company itself.

. . . .

We sent a question out to the judge asking if we were entitled to make a recommendation as to the settlement offer that Transnation should have made to the plaintiffs Millies. When the answer came back and we were simply informed to follow the instructions we awarded no money because we thought we were prohibited by the instructions and verdict form. When the answer came back and we were simply told to follow the instructions, another juror, No. 21, told all of us that we should leave the verdict form blank regarding any money due to the Millies because she knew the trial court judge, knew him to be fair, and that he would pencil in something for the Millies in the way of a fair settlement of their claims. At the very end of our deliberations, the foreperson, juror Debbie Stewart, No.5, also reinforced our understanding that the trial judge was going to award the Millies something fairly and equitably, since we believed we were prohibited from doing so.

. . . .

I was influenced by juror remarks that the judge was going to award something fair to the Millies.

*See* CP at 521-22, 527-28.

Juror Allyson Burlington also signed a declaration in support of the Millies'

motion for a new trial. Burlington stated:

. . . all of the jurors seemed to agree that the plaintiffs were entitled to have something in the way of money damages, but we were unable to award damages because of the way the verdict form instructed us.

. . . .

17

> We awarded no money because we thought we were prohibited from doing do [sic] by the instructions and verdict form. I recall that Jury Instruction No. 9 required us to find that each of the laundry list items on it had to be met for us to vote "yes" on the verdict form. If any one of these items was not found, then we had to vote "no" on the verdict form.

CP at 524-25.

In addition to seeking a new trial, Richard and Susan Millies moved for judgment as a matter of law. They did not move for judgment as a matter of law before the trial court submitted the case to the jury. In their motion, the Millies argued the evidence is insufficient to support a verdict for Transnation on any of the issues presented to the jury, including the violation of IFCA, CPA, its negligence, and breach of its contract with the Millies. The trial court denied the motion for a new trial and judgment as a matter of law.

On April 30, 2013, the trial court held a hearing to determine whether any claims remained unresolved. At the hearing, the court noted that the Millies "did not take exception to the court's verdict form or to the contract elements or the affirmative defense. There's nothing on the record that I listened to completely wherein there's exception taken to it." RP at 365. The Millies disagreed with the trial court's comments and insisted they objected to the court's instruction 7 during the late afternoon, on January 30, after the court dismissed the clerk. The trial court responded:

> Now what—what is of record is—on the 30th when we're here, I on the record say "We're going to go off the record now, we're going to go ahead and talk about the instructions, I'm going to let the clerk go," which I did, and that was the end of the recording on that day.
> So that—You're correct. There's no record of that. But, what I did

18

do—and I followed up on this— was allow, then, of record, while the jury was just winding up its deliberations, any exceptions to the instructions given or not given. So that's when—that's the time that it would have been done.

RP at 368.

## LAW AND ANALYSIS

### *Jury Instruction*

The Millies assign error to jury instruction 7 and ask this court to remand for a new trial because the instruction erroneously instructed the jury concerning a breach of contract claim. We decline to reach the assignment because the Millies failed to object to the jury instruction at trial.

A litigant who disagrees with a jury instruction must, before the trial court, "state distinctly the matter to which he objects and the grounds of his objection, specifying the number, paragraph or particular part of the instruction to be given or refused and to which objection is made." CR 51(f). The purpose of this rule is to enable the trial court to correct any mistakes in the instructions in time to prevent the unnecessary expense of a second trial. *Estate of Ryder v. Kelly-Springfield Tire Co.*, 91 Wn.2d 111, 114, 587 P.2d 160 (1978); *Roumel v. Fude*, 62 Wn.2d 397, 400, 383 P.2d 283 (1963). The rule promotes fairness to the trial court and efficiency.

Failure to object to an instruction in compliance with CR 51(f) generally precludes appellate review of the instruction. *Reed v. Pennwalt Corp.*, 93 Wn.2d 5, 6-7, 604 P.2d

164 (1979). When no party objects to an instruction, it becomes the law of the case. *Guijosa v. Wal-Mart Stores, Inc.*, 144 Wn.2d 907, 917, 32 P.3d 250 (2001). Such instructional defects may not serve as the basis for a new trial. *Trueax v. Ernst Home Center, Inc.*, 124 Wn.2d 334, 339, 878 P.2d 1208 (1994).

Richard and Susan Millies cultivate four points in an attempt to avoid waiver of an objection to jury instruction 7. First, the Millies insist they protested to jury instruction 7 during the evening conference on January 30, 2013. Because that conference was off-the-record, the only support for that assertion comes from the Millies' counsel.

The trial court permitted the Millies to make a record of any objections on January 31. The Millies failed to object to instruction number 7 then and provide no explanation now for this failure. This court must base its decision on the factual record. *State v. Morris*, 87 Wn. App. 654, 666, 943 P.2d 329 (1997); *Bich v. Gen. Elec. Co.*, 27 Wn. App. 25, 34, 614 P.2d 1323 (1980). So we reject this contention.

Second, the Millies argue they objected to the court's jury instruction 7 when they offered their own breach of contract instruction, an unmodified version of WPI 300.02. Proposing another instruction is insufficient, however. Even when parties propose alternate instructions, appellate courts refuse to review alleged errors in the trial court's instructions. *Haslund v. City of Seattle*, 86 Wn.2d 607, 615-16, 547 P.2d 1221 (1976); *State v. Warwick*, 16 Wn. App. 205, 212, 555 P.2d 1386 (1976). Such an implied objection is "useless" because it fails to apprise the trial court of the particular part of the

20

court's instruction to which objection is made. CR 51; *Trueax*, 124 Wn.2d at 339; *Burlingham-Meeker Co. v. Thomas*, 58 Wn.2d 79, 82, 360 P.2d 1033 (1961); *Stuart v. Consol. Foods Corp.*, 6 Wn. App. 841, 846, 496 P.2d 527 (1972). This reviewing court need not consider such groundless objections on appeal. *Trueax*, 124 Wn.2d at 342.

Third, Richard and Susan Millies contend they apprised the trial court of their objection in their trial brief. In the trial brief, the Millies argued Transnation violated their contract by failing to act in good faith. Good faith, the Millies note, "requires an insurer to conduct a reasonable investigation. It must base any decision on adequate information and not overemphasize its own interest. If it doesn't, it will have breached the covenant and, therefore, the policy.[2]" CP at 355 (internal citations omitted). In that footnote, the Millies wrote, "A breach of contract action against an insurer is a separate cause of action and the jury in this case should be instructed separately on this claim. *Coventry, supra* [at] 278 (*plaintiff may simultaneously bring both*)." CP at 355 (emphasis in original). *Coventry*, however, only states that a party may bring a breach of contract and bad faith claim. 136 Wn.2d at 278. A citation to *Coventry* in a trial brief failed to apprise the trial court as to the legal argument of the Millies. More importantly, the citation did not inform the court as to the jury instruction to which the Millies object. Not knowing the Millies objected to instruction number 7, the trial court could not correct any potential mistakes. Any objection should be placed on the record at the time assigned during trial for objections, not buried in a brief.

Fourth, the Millies maintain that Transnation concedes that jury instructions were crafted for the purpose of separating the tort claims from the breach of contract claim. Nevertheless, the Millies fail to explain how this drafting apprised the court of its objection to instruction number 7 or preserved the error. The purpose behind crafting and drafting jury instructions is immaterial to the need to object to an instruction.

*Judgment as a Matter of Law*

Richard and Susan Millies next argue that substantial evidence does not support a verdict for Transnation, because the jury's verdict excused Transnation of paying them anything for the missed easement. Thus, they contend the trial court should have granted their motion for judgment as a matter of law after trial. We decline to address the merits of this contention since the Millies failed to submit a motion for judgment as a matter of law before submission of the case to the jury.

CR 50 controls motions for judgment as a matter of law. The rule reads, in relevant part:

> **(a) Judgment as a Matter of Law.**
> (1) *Nature and Effect of Motion.* If, during a trial by jury, a party has been fully heard with respect to an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find or have found for that party with respect to that issue, the court may grant a motion for judgment as a matter of law against the party on any claim, counterclaim, cross claim, or third party claim that cannot under the controlling law be maintained without a favorable finding on that issue. . . .
> (2) *When Made. A motion for judgment as a matter of law may*

22

> *be made at any time before submission of the case to the jury.*
> **(b) Renewing Motion for Judgment After Trial; Alternative Motion for New Trial.** If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. The movant *may renew* its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment.

(Emphasis added.) A reading of CR 50 strongly implies that a party waives the right to file a motion for a judgment as a matter of law after a jury verdict if that party withheld the motion before submittal of the issues to the jury. A motion after trial may only be "renewed."

The critical language in CR 50 arises from the 2005 amendments to the civil rules. Before 2005, a party could move for judgment as a matter of law after the case had been submitted to the jury regardless of whether the party previously sought the relief. Former CR 50(b); *Mega v. Whitworth Coll.*, 138 Wn. App. 661, 668-69, 158 P.3d 1211 (2007). Drafters of the 2005 amendments to CR 50 intended to change this rule. The drafters explained:

> This suggested amendment changes Washington practice and *requires* that a motion for judgment as a matter of law be made before submission of the case to the jury as a condition to renewing the motion post-verdict. The Committee concluded that requiring a motion for judgment as a matter of law before the case is submitted to the jury enhances the administration of justice because the parties and/or the court can correct possible errors before verdict. Absent such a motion before

submission of the case to the jury, a party may not bring a motion for judgment as a matter of law thereafter.

4 KARL B. TEGLAND, WASHINGTON PRACTICE: RULES PRACTICE Cr 50 drafters' cmt. at 211 (5th ed. 2006).

One of this court's divisions has already addressed this subject and concurred with our reading of CR 50. In *Hanks v. Grace*, 167 Wn. App. 542, 273 P.3d 1029 (2012), a realtor sought to overturn a verdict entered in favor of a former client. He argued in part that the trial court erroneously denied his motion for judgment as a matter of law filed after the verdict. This court refused to entertain the assignment of error because the realtor had not advanced the motion before submittal of the case to the jury. The *Hanks* court noted that CR 50 demands that a party first move for judgment as a matter of law before the trial court submits the case to the jury to preserve any opportunity to renew the motion after the verdict. The realtor argued that CR 50 is ambiguous because the rule states a party "may," rather than "must," move for judgment as a matter of law before submission of the case to the jury. Therefore, according to the realtor, forwarding the motion before submittal of the case is optional, rather than mandatory. The court rejected the argument impliedly because the rule renders a motion optional, although waived if not advanced before submission of the issues to the jury.

The trial court did not deny Richard and Susan Millies' motion for judgment as a matter of law because of the failure to advance the motion before submittal of the case to

24

the jury. Nevertheless, we may affirm the trial court on any correct ground, even though that ground was not considered by the trial court. *Nast v. Michels*, 107 Wn.2d 300, 308, 730 P.2d 54 (1986); *Heath v. Uraga*, 106 Wn. App. 506, 515, 24 P.3d 413 (2001).

Transnation also asks that we refuse to hear the merits of this assignment of error because the Millies failed to request that the verdict form direct the jury to deliberate on what damages they were entitled to pursuant to the Transnation title insurance policy, outside consideration of the four alleged causes of action. To that end, Transnation contends CR 49 barred the trial court from entering judgment as a matter of law because the Millies failed to submit the property's diminution-in-value question to the jury in a special verdict. Because we resolve this assignment of error on other grounds, we do not address the applicability of CR 49.

## New Trial

Richard and Susan Millies also maintain that they are entitled to a new trial under CR 59 because of (1) misconduct by the jury, (2) misconduct by Transnation's counsel; (3) irregularities in the proceedings, (4) inadequate damages, (5) inadequate assessment of damages, (6) the verdict was contrary to the evidence at trial, and (7) substantial justice has not been done. We address the alternate grounds in that order. CR 59 reads, in relevant part:

> **(a) Grounds for New Trial or Reconsideration.** On the motion of the party aggrieved, a verdict may be vacated and a new trial granted to all or any of the parties, and on all issues, or on some of the issues when such

25

issues are clearly and fairly separable and distinct, or any other decision or order may be vacated and reconsideration granted. Such motion may be granted for any one of the following causes materially affecting the substantial rights of such parties:

(1) Irregularity in the proceedings of the court, jury or adverse party, or any order of the court, or abuse of discretion, by which such party was prevented from having a fair trial;

(2) Misconduct of prevailing party or jury.

. . . .

(5) Damages so excessive or inadequate as unmistakably to indicate that the verdict must have been the result of passion or prejudice;

(6) Error in the assessment of the amount of recovery whether too large or too small, when the action is upon a contract, or for the injury or detention of property;

(7) That there is no evidence or reasonable inference from the evidence to justify the verdict or the decision, or that it is contrary to law;

(8) Error in law occurring at the trial and objected to at the time by the party making the application; or

(9) That substantial justice has not been done.

A. Jury misconduct

The Millies contend the jury committed misconduct in reaching its verdict. To support their claim, the Millies rely on juror affidavits. We hold the affidavits to contain evidence impeaching a jury verdict and thus impermissible to support an accusation of jury misconduct.

A court generally does not inquire into the internal process by which a jury reaches its verdict. *Gardner v. Malone*, 60 Wn.2d 836, 840, 376 P.2d 651 (1962). The individual or collective thought processes leading to a verdict cannot be used to impeach a jury verdict. *Breckenridge v. Valley Gen. Hosp.*, 150 Wn.2d 197, 204-05, 75 P.3d 944 (2003). A juror's postverdict statements regarding the way in which the jury reached its

26

verdict cannot be used to support a motion for a new trial. *Breckenridge*, 150 Wn.2d at 205.

To determine whether evidence of misconduct inheres in the verdict our Supreme Court provided the following test:

> The mental processes by which individual jurors reached their respective conclusions, their motives in arriving at their verdicts, the effect the evidence may have had upon the jurors or the weight particular jurors may have given to particular evidence, or the jurors' intentions and beliefs, are all factors inhering in the jury's processes in arriving at its verdict, and, therefore, inhere in the verdict itself, and averments concerning them are inadmissible to impeach the verdict.

*Cox v. Charles Wright Acad., Inc.*, 70 Wn.2d 173, 179-80, 422 P.2d 515 (1967).

Richard and Susan Millies rely on statements from jurors who concluded, among other views, that their "hands were tied" and that the trial judge would "pencil something in." These juror statements reflect jurors' beliefs and thought processes in arriving at the verdict. All of the statements the Millies rely on as evidence of misconduct are inadmissible. Without those affidavits, the Millies have no support for their claimed juror misconduct. Therefore, we decline to grant the Millies a new trial on this ground.

B. Counsel misconduct

For the first time on appeal the Millies argue misconduct by Transnation's counsel entitles them to a new trial. Questions not raised in trial court will not be considered on appeal. *State v. Long*, 58 Wn.2d 830, 365 P.2d 3 (1961), *reversed on other grounds by Draper v. State of Wash.*, 372 U.S. 487, 83 S. Ct. 774, 9 L. Ed. 2d 899 (1963). In such

27

circumstances, the appellant waives those errors. *Valley View Indus. Park v. City of Redmond*, 107 Wn.2d 621, 630, 733 P.2d 182 (1987). Therefore, we decline to address this argument.

C. Irregularities in proceedings

In their brief, Richard and Susan Millies contend the trial court should have granted a new trial because of irregularities in proceedings, the first basis for a new trial under CR 59(a). The Millies, however, run together this argument with their arguments of misconduct by the jury and the opposing attorney. Therefore, we do not address this contention as a discrete argument. If the Millies wished us to entertain any other alleged irregularities in the proceedings as an independent basis for a new trial, they should have advanced the argument in their brief and provided us citations to support the argument. This court does not review errors alleged but not argued, briefed, or supported with citation to authority. RAP 10.3; *Valente v. Bailey*, 74 Wn.2d 857, 858, 447 P.2d 589 (1968); *Avellaneda v. State*, 167 Wn. App. 474, 485 n.5, 273 P.3d 477 (2012).

D. Inadequate assessment of damages

The Millies contend inadequate damages or an error in the assessment of damages require that this court grant them a new trial. These contentions arise from two separate subsections of CR 59(a), subsections (5) and (6). The subsections read:

> (5) Damages so excessive or inadequate as unmistakably to indicate that the verdict must have been the result of passion or prejudice;
> (6) Error in the assessment of the amount of recovery whether too

28

large or too small, when the action is upon a contract, or for the injury or detention of property;

Both subsections address excessive or inadequate damages, such that one might question the need for discrete subsections. We assume that subsection (5) concentrates on undue sympathy or ill-will toward one party, while subsection (6) concerns itself with a dispassionate mathematical or calculation error of the judge or jury. *Beglinger v. Shield*, 164 Wash. 147, 153-55, 2 P.2d 681 (1931); *McCush v. Whatcom Timber Co.*, 139 Wash. 314, 329-30, 246 P. 933 (1926); See 4 KARL B. TEGLAND, WASHINGTON PRACTICE: PRACTICE CR 59 at 538-44 (6th ed. 2013). The former is a Dr. McCoy error and the latter is a Spock error.

Since the jury determined Transnation breached no duty, the jury never deliberated on the amount of damages. Because the verdict grants the Millies no damages, their damages cannot be inadequate or assessed incorrectly. We find no case in which the court granted a new trial on excessive or inadequate damages when the jury entered a defense verdict.

E. Lack of evidence

Like their claim for judgment as a matter of law, the Millies argue the verdict was contrary to the evidence at trial. CR 59(a)(7) allows the trial court to vacate a jury's verdict and grant the moving party a new trial if the trial court finds that "there is no evidence or reasonable inference from the evidence to justify the verdict or the decision,

29

or that it is contrary to law." Under CR 59(a)(7), a trial court abuses its discretion by denying a motion for a new trial if the verdict is contrary to the evidence. *Palmer v. Jensen*, 132 Wn.2d 193, 198, 937 P.2d 597 (1997).

A thorny question arises because, when viewing the evidence in the abstract, the evidence shows Richard and Susan Millies must receive some recovery. Transnation agreed the Millies suffered a loss under the title policy and that the loss was at least $25,000. In this light, the verdict was contrary to the evidence. Nevertheless, the jury did not render a verdict in the abstract. The trial court instructed the jury on the law to apply to the evidence. One instruction directed the jury to render a verdict for Transnation if the insurance company proved it fulfilled the terms of the contract with the Millies "by investigating the claim and tendering payment in a timely manner based on a reasonable fair market appraisal." CP at 407. The jury heard evidence that Transnation investigated the claim and timely tendered payment of $25,000, a reasonable fair market sum. Viewed in this light, sufficient evidence supports the jury's verdict. So we return to the crux of the problem on appeal which is the Millies' failure to object to the jury instruction, the failure to submit a jury instruction directing the jury to award damages on the contract regardless of whether Transnation acted in good faith, or the failure to ask, before the submittal of the case to the jury, for a ruling that, as a matter of law, they are entitled to at least $25,000.

30

No Washington decision answers the question of whether, under CR 59, the court, when addressing a motion for a new trial, views the evidence in the abstract or in the light of the jury instructions. We hold that the trial court should address the motion by viewing the evidence in light of the jury instructions because of language from other jurisdictions and because such a holding is the only reasonable conclusion.

The moving party may receive a new trial, under CR 59(a)(7), because the evidence does not justify the verdict. Stated differently, the jury made a mistake. Nevertheless, the jury does not err and the verdict is not contrary to the law if the jury follows the jury instructions. CR 59(a)(7) allows the trial court to vacate a jury's verdict and grant the moving party a new trial if the trial court finds that "there is no evidence or reasonable inference from the evidence to justify the verdict or the decision, or that it is contrary to law." Jury instructions not objected to become the law of the case. *State v. Salas*, 127 Wn.2d 173, 182, 897 P.2d 1246 (1995).

Where a verdict indicates that a jury disregarded the court's instructions, a new trial is proper. *State v. Davenport*, 100 Wn.2d 757, 763-65, 675 P.2d 1213 (1984); *Zorich v. Billingsley*, 52 Wn.2d 138, 141, 324 P.2d 255 (1958); *Nichols v. Lackie*, 58 Wn. App. 904, 907, 795 P.2d 722 (1990). The converse should be true. If the jury obeys the trial court's instruction, a new trial is improper.

No foreign case addresses our quandary, but language in numerous cases support the proposition that a party is not entitled to a new trial if the evidence justifies the

31

verdict based on instructions given, even if the instructions are wrong. When ruling on a motion for a new trial in a civil case tried to a jury, the trial justice undertakes her independent appraisal of the evidence in the light of her charge to the jury. *Connor v. Schlemmer*, 996 A.2d 98, 114-15 (R.I. 2010); *Kurczy v. St. Joseph Veterans Ass'n*, 713 A.2d 766, 770 (R.I. 1998); *State v. Doctor*, 690 A.2d 321, 329 (R.I. 1997). When it is clear that the jury was confused and the verdict rendered is illogical and unreasonable in light of the instructions given, the trial court is obliged to set the verdict aside. *Labatt v. Grunewald*, 182 Conn. 236, 438 A.2d 85, 88 (1980). As a general rule, a verdict will be set aside as contrary to law where, under the evidence, the verdict is contrary to the instructions given by the trial court. *City of Mission Hills v. Sexton*, 284 Kan. 414, 160 P.3d 812, 820 (2007); *In re Acquisition of Prop. by Eminent Domain*, 236 Kan. 417, 421, 690 P.2d 1375 (1984). When the evidence is conflicting but sufficient to support a finding of fact under the instruction, a new trial is not warranted. *Kaiser Cement & Gypsum Corp. v. Allis-Chalmers Mfg. Co.*, 35 Cal. App. 3d 948, 958-59, 111 Cal. Rptr. 210 (1973). As a general rule a verdict will be set aside as contrary to law when, under the evidence, it is contrary to the instructions given by the court. *Burrell v. Goss*, 245 Miss. 420, 146 So. 2d 78, 80 (1962). In an action on a fire policy, the oral charge of the court constituted the "law of case" for guidance of jury on the trial, and whether the charge correctly stated the law was not a matter for a jury's consideration. *Franklin Fire Ins. Co. v. Slaton*, 200 So. 564, 566 (Ala. 1941).

F. Substantial justice

Richard and Susan Millies's last contention comes from CR 59(a)(9). The Millies contend substantial justice has not been done. We agree that justice would require an award to the Millies of at least $25,000, but reject the argument anyway. We are not free to grant substantial justice outside the confines of the steps taken or not taken by the Millies at trial. Based on the jury instructions, the jury was free to award no damages.

Courts rarely grant a new trial for lack of substantial justice under CR 59(a)(9) because of the other broad grounds afforded under this rule. *Lian v. Stalick*, 106 Wn. App. 811, 825, 25 P.3d 467 (2001). The authority of the trial court, and, in turn, this court to grant a new trial on the ground that substantial justice has not been done is severely limited. *Cerjance v. Kehres*, 26 Wn. App. 436, 440, 613 P.2d 192 (1980). We are not allowed simply to substitute our judgment for that of the jury. *State v. Hall*, 74 Wn.2d 726, 727, 446 P.2d 323 (1968); *Pac. Nat'l Bank of Wash. v. Morrissey*, 17 Wn. App. 525, 529, 564 P.2d 337 (1977). A party may not obtain a new trial on the ground of substantial justice because of an erroneous jury instruction if the party did not object to the instruction at trial. *Cerjance v. Kehres*, 26 Wn. App. at 440-41.

In *Cerjance v. Kehres*, this court reversed a trial court's grant of a new trial on the ground of substantial justice. The defendant sought the new trial in part on the basis of an erroneous jury instruction, but the defendant had not objected to the instruction before the jury's deliberation.

33

The Millies argument that substantial justice has not been done is the same arguments they advance to show the verdict is contrary to the evidence and the trial court incorrectly instructed the jury. For the same reasons we rejected the previous arguments, we reject the Millies' final argument.

## CONCLUSION

We affirm the verdict in favor of Transnation and the trial court's denial of Richard and Susan Millies' posttrial motions. The Millies did not raise in their complaint or during trial a claim that they are entitled to recover the $25,000 tendered by Transnation in response to their claim of loss. This question is not before us, and we deliver no ruling on the question.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Siddoway, C.J.

_____
Lawrence-Berrey, J.

34